UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
PEOPLE FOR THE ETHICAL         )
TREATMENT OF ANIMALS           )
                               )
           Plaintiff,          )
                               )
           v.                  )   Civil No. 10-1818 (JDB)
                               )
NATIONAL INSTITUTES OF HEALTH  )
DEPARTMENT OF HEALTH AND       )
HUMAN SERVICES                 )
                               )
           Defendant.          )
_____)
```

### DEFENDANT'S MOTION TO DISMISS IN PART AND FOR SUMMARY JUDGMENT

Defendant, National Institutes of Health, by its undersigned attorneys, respectfully moves the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing part of plaintiff's case for failure to timely exhaust administrative remedies.  Alternatively, and for the remainder of the case, defendant moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for an order granting summary judgment in favor of defendant on the grounds that no genuine issue as to any material fact exists and defendant is entitled to judgment as a matter of law.  In support of this motion, the Court is respectfully referred to defendant's accompanying declarations, exhibits and <u>Vaughn</u> index, the Statement Of Material Facts As To Which There Is No Genuine Issue, and the Memorandum Of Points And Authorities In Support Of Defendant's Motion to Dismiss in Part and For Summary Judgment.

A proposed order consistent with the relief sought is also attached.

Respectfully Submitted,

RONALD C. MACHEN JR.
D.C. BAR # 447889
United States Attorney
for the District of Columbia

RUDOLPH CONTRERAS
D.C. BAR # 434122
Chief, Civil Division

By:   /s/
MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. – Civil Division
Washington, D.C. 20530
(202) 514-7226
Marina.Braswell@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
PEOPLE FOR THE ETHICAL          )
TREATMENT OF ANIMALS            )
                                )
            Plaintiff,          )
                                )
            v.                  )   Civil No. 10-1818 (JDB)
                                )
NATIONAL INSTITUTES OF HEALTH   )
DEPARTMENT OF HEALTH AND        )
HUMAN SERVICES                  )
                                )
            Defendant.          )
_____)

STATEMENT OF MATERIAL FACTS AS
TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rule 7.1(h), defendant, National Institutes of Health ("NIH") submits this statement of material facts as to which there is no genuine issue:

1.  By letter dated July 5, 2007, plaintiff submitted a request to NIH, pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), requesting copies of all official investigative reports, preliminary notes, testimonies, memos, meeting minutes, phone conversations, emails, and other materials related to all NIH investigations into complaints filed 2005-present regarding three specifically named individuals at the Auburn University's Scott-Ritchey Research Center in Auburn, Alabama.  This request was given Case No. 34102.  Declaration of Carol Maloney ("Maloney Decl."), copy attached, ¶ 4.

2.  By letter dated February 20, 2008, NIH responded to plaintiff's July 5, 2007 request.  In that response, NIH stated

that the agency could neither confirm nor deny the existence of responsive records, and asserted that if the records were to exist, they would be exempt under FOIA Exemption 6.  Maloney Decl., ¶ 5.

3.  NIH's February 20, 2008 response also provided plaintiff its appeal rights and informed plaintiff to send an appeal within 30 days of receipt of the response letter.  Id.

4.  NIH did not receive a timely appeal for Case No. 34102. Id., ¶ 7.

5.  By letter dated August 21, 2008, plaintiff challenged NIH's February 20, 2008 response and requested both the records requested in plaintiff's July 25, 2007 request, and separately requested a copy of a confidentiality agreement between Auburn University and NIH relating to an alleged investigation of one of the specifically named individuals cited in plaintiff's July 25, 2007 request.  Id. at ¶ 8.

6. By letter dated August 26, 2008, NIH explained that NIH had previously responded to the first requested item in NIH's letter dated February 20, 2008, and had provided appeal rights at that time.  NIH's letter informed plaintiff that the request for the confidentiality agreement would be treated as a new FOIA request and would be responded to shortly.  Id. at ¶ 9.

7.  By letter dated August 29, 2008, NIH responded to plaintiff's request for a confidentiality agreement, and stated

2

that the agency could neither confirm nor deny the existence of responsive records.  NIH also asserted that if the records were to exist, they would be exempt under FOIA Exemption 6.  Maloney Decl., ¶ 10.

8.  Plaintiff filed a timely appeal in response to NIH's August 29, 2008 letter.  Id. at ¶ 11 & Ex. 1.

9.  By letter dated July 12, 2010, NIH responded to plaintiff's appeal and explained the basis for upholding the response to neither confirm nor deny the existence of responsive records.  In addition, the appeal decision explained why FOIA Exemptions 6 and 7(C) would apply to protect the records even if they existed.  Id. at ¶ 12 & Ex. 2.

10.  By letter dated February 28, 2006, plaintiff filed a FOIA request with NIH for records from the NIH Office of Laboratory Animal Welfare ("OLAW") files concerning Auburn University.  Id. at ¶ 13 & Ex. 3.

11.  By letters dated November 22 and December 28, 2006, NIH responded to plaintiff's February 28, 2006 letter, stating that 384 responsive pages had been located and certain information had been withheld under the FOIA.  Id. at ¶ 14 & Exs. 4 and 5.

12.  By letter dated February 1, 2007, plaintiff filed a timely administrative appeal.  Id. at ¶ 15 & Ex. 6.

13.  By letter dated July 12, 2010, the Department of Health and Human Services issued an appeal decision and explained the

3

basis for the withholding of records or portions of records under FOIA Exemptions 4, 6, 7(C), and 7(D).  Maloney Decl., ¶ 16 & Ex. 7.

14. NIH invoked Exemption 4 of the FOIA to protect information from disclosure that constitutes "'commercial or financial information obtained from a person and privileged or confidential.'"  Id. at ¶ 19, quoting 5 U.S.C. § 552(b)(4).  The records at issue were voluntarily submitted to NIH, are not the type of documents the submitter would customarily make public, and their disclosure would cause harm to the submitter and impair the government's ability to obtain necessary information in the future, which would impair the effectiveness of an NIH program. Id. at ¶¶ 19-23; Declaration of Patricia M. Mantoan, Ex. 4.

15.  NIH invoked Exemption 6 of the FOIA, along with, in some cases, Exemption 7(C) of the FOIA, to protect information the release of which would constitute a clearly unwarranted invasion of personal privacy.  The information withheld consists of personal information such as the names and identifying information of complainants, targets, witnesses and co-workers of targets mentioned in investigatory records.  Id. at ¶¶ 25-26. The information withheld does not shed light on the government's performance of its duties.  Id. at ¶ 26.

16.  NIH invoked Exemption 7(C) of the FOIA to withhold personal information in records compiled for law enforcement

4

purposes the release of which would constitute an unwarranted invasion of personal privacy. The information withheld consists of personal information such as the names and identifying information of complainants, targets, witnesses and co-workers of targets mentioned in investigatory records. Maloney Decl., ¶ 27.

17. NIH invoked Exemption 7(D) of the FOIA to withhold records or information compiled for law enforcement purposes the release of which could reasonably be expected to disclose the identities of confidential sources who provided information under implied assurances of confidentiality in connection with the investigations at issue. Id. at ¶¶ 28 & 29. The disclosure of information relating to the identities of these sources could have a chilling effect on their willingness to cooperate with NIH in the future. Id. at ¶ 29.

18. With respect to plaintiff's request for access to documents concerning investigations of alleged wrongdoing by specifically identified individuals, NIH refused to confirm or deny whether the agency maintains responsive records, and also cited FOIA Exemptions 6 and 7(C). Being identified as the target of an investigation that has not been acknowledged publicly by the agency would cause a significantly unwarranted invasion of personal privacy. Declaration of Susan R. Cornell, ¶ 10.

19.   All reasonably segregable information has been released to plaintiff.   Maloney Decl., ¶ 34.

Respectfully Submitted,


RONALD C. MACHEN JR.
D.C. BAR # 447889
United States Attorney
for the District of Columbia


RUDOLPH CONTRERAS
D.C. BAR # 434122
Chief, Civil Division


By:   /s/
MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. – Civil Division
Washington, D.C. 20530
(202) 514-7226
Marina.Braswell@usdoj.gov

6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
PEOPLE FOR THE ETHICAL        )
TREATMENT OF ANIMALS          )
                              )
            Plaintiff,        )
                              )
            v.                )   Civil No. 10-1818 (JDB)
                              )
NATIONAL INSTITUTES OF HEALTH )
DEPARTMENT OF HEALTH AND      )
HUMAN SERVICES                )
                              )
            Defendant.        )
_____)


MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS IN PART AND FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

This action was commenced by plaintiff People for the
Ethical Treatment of Animals ("PETA"), pursuant to the Freedom of
Information Act ("FOIA"), 5 U.S.C. § 552, as a result of three
FOIA requests, dated February 28, 2006, July 15, 2007, August 21,
2008, served by plaintiff on defendant National Institutes of
Health ("NIH").  In particular, plaintiff sought access to
various documents and other materials related to all NIH
investigations into complaints filed from 2005 to the present
regarding three specifically named individuals at the Auburn
University's Scott-Ritchey Research Center in Auburn, Alabama.
Declaration of Carol Maloney ("Maloney Decl."), copy attached,
¶ 4.  Plaintiff also sought access to a confidentiality agreement
between Auburn University and NIH relating to materials and

information with regard to an investigation of one of the three specifically named individuals.  Maloney Decl., ¶ 8.  NIH refused to confirm or deny whether it had records responsive to these two requests.  Id. at ¶¶ 5 & 10; Declaration of Susan R. Cornell ("Cornell Decl."), ¶¶ 4-9.

Additionally, plaintiff sought access to records regarding the NIH Office of Laboratory Animal Welfare ("OLAW") files concerning Auburn University.  Maloney Decl., ¶ 13.  NIH has withheld all or portions of certain documents responsive to this request under FOIA Exemptions 4, 6, 7(C) and 7(D).  Id., at ¶ 16. All reasonably segregable releasable information has been provided to plaintiff.  Id. at ¶ 34.

Finally, plaintiff's Complaint also raises a claim under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).  In particular, in Claim III of the Complaint plaintiff argues that NIH's alleged decision to require Auburn University to enter into a confidentiality agreement that would bar the University from disclosing records to PETA is arbitrary and capricious, an abuse of discretion, and in violation of law.  Complaint, ¶ 27.

On the contrary, plaintiff's APA claim should be dismissed because APA review is only available when there is no other remedy but here plaintiff has adequate remedies outside of the APA.  Moreover, plaintiff's APA claim is nothing more than a collateral attack on a decision made by Auburn University under

2

the Alabama Open Records Act, given that plaintiff's APA claim stems from Auburn University's responses to plaintiff's requests under this state law.  Nonetheless, even if APA review is available, the APA was not violated by the circumstances surrounding NIH's use of confidentiality agreements.

Therefore, as demonstrated below, and in the accompanying declarations and <u>Vaughn</u> indices addressing the withheld documents and information and plaintiff's APA claim, part of plaintiff's case is subject to dismissal and, alternatively or in addition, judgment should be entered in favor of defendant because there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law.

<u>ARGUMENT</u>

I.   Plaintiff Failed to Timely Exhaust all Admministrative
     Remedies and NIH Properly Refused to Confirm or
     <u>Deny the Existence of Certain Records.</u>

In plaintiff's request dated July 25, 2007, plaintiff sought access under the FOIA to investigative records regarding three specifically named individuals.  Cornell Decl., ¶ 4 & Ex. 1.  NIH informed plaintiff that the agency could neither confirm nor deny the existence of any responsive records and that such records, if they existed, would be exempt under FOIA Exemption 6.  <u>Id</u>. at ¶ 5.  Plaintiff failed to file a timely appeal of this decision. <u>Id</u>. at ¶ 7; Maloney Decl., ¶ 7.

Subsequently, by letter dated August 21, 2008, plaintiff

3

requested the same information again, as well as a copy of any
confidentiality agreement between Auburn University and NIH
concerning an alleged investigation into the research of a
specifically identified individual and his colleagues.  Cornell
Decl., ¶ 7 & Ex. 6.  NIH informed plaintiff that it had
previously responded to its request regarding investigatory
records concerning the three specifically identified individuals,
and that with respect to plaintiff's new request for a copy of
confidentiality agreement as it related to a specific individual,
NIH could neither confirm nor deny the existence of responsive
records.  NIH also stated that such records, if they existed,
would be exempt under FOIA Exemption 6.  Id. at ¶¶ 8-9 & Exs. 5 &
6.

> A.   Plaintiff Failed to Timely Exhaust
>      Administrative Remedies with Respect to its
>      Request for Investigatory Records on Three
>      Named Individuals.

     The Court of Appeals for this Circuit has made clear that a
plaintiff must exhaust the administrative remedies available
under FOIA prior to seeking relief in federal court.  Oglesby v.
U.S. Dep't of the Army, 920 F.2d 57, 61-62 (D.C. Cir.
1990); see also Wilbur v. CIA, 355 F.3d 675, 677 (D.C. Cir. 2004)
("exhaustion of administrative remedies is a mandatory
prerequisite to a lawsuit under FOIA") (citation and
quotation marks omitted).  As the Court of Appeals explained,
exhaustion is necessary "so that [an] agency may function

4

efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." Oglesby, 920 F.2d at 61.

The administrative exhaustion requirement under FOIA is not a jurisdictional bar to suit, but rather a prudential consideration. Wilbur, 355 F.3d at 677. "Nonetheless, as a jurisprudential doctrine, failure to exhaust precludes judicial review" because a contrary rule "'would cut off the agency's power to correct or rethink initial misjudgments or errors.'" Hidalgo v. FBI, 344 F.3d 1256, 1258-60 (D.C. Cir. 2003) (quoting Oglesby, 920 F.2d at 64). "[F]ailure to exhaust . . . precludes judicial review where . . . the purposes of administrative exhaustion and the particular administrative scheme support such a bar." Ivey v. Paulson, 227 Fed. Appx. 1 (D.C. Cir. 2007).

Thus, when a FOIA plaintiff attempts to obtain judicial review without first fully and timely exhausting available administrative remedies, the lawsuit is subject to dismissal for failure to state a claim under Rule 12(b)(6), or judgment as a matter of law for the agency defendant under Rule 56. See Jones v. U.S. Dep't of Justice, 576 F. Supp. 2d 64, 66 (D.D.C. 2008) ("When a FOIA defendant disputes that a FOIA plaintiff has fulfilled the exhaustion requirement, the matter is properly the subject of a motion brought under Rule 12(b)(6) for failure to

state a claim upon which relief may be granted"); Bonner v. SSA, 574 F. Supp. 2d 136, 140 (D.D.C. 2008) (holding that where "there is no genuine dispute that plaintiff did not exhaust his administrative remedies . . . prior to filing [a] lawsuit, [the agency is] entitled to judgment as a matter of law").

A FOIA requester fails to exhaust administrative remedies whenever the requester does not comply with the administrative process set forth under FOIA, including a failure to: (1) reasonably describe the records being sought, Kowalczyk v. DOJ, 73 F.3d 386, 388 (D.C. Cir. 1996); (2) provide a third-party authorization where required by agency regulation, Taylor v. U.S. Dep't of Justice, 257 F. Supp. 2d 101, 112 (D.D.C. 2003); (3) comply with fee requirements, Oglesby, 920 F.2d at 66; and (4) administratively appeal an adverse determination on a FOIA request, Hidalgo, 344 F.3d at 1258-60. If a FOIA plaintiff attempts to obtain judicial review without first undertaking full and timely administrative exhaustion, the lawsuit is subject to immediate dismissal. Oglesby, 920 F.2d at 66; Hamilton Securities Group, Inc. v. Dep't of Housing and Urban Development, 106 F. Supp. 2d 23, 27 (D.D.C. 2000) ("[i]t is well settled that full and timely exhaustion of administrative remedies is a prerequisite to judicial review under FOIA"), summary affirmance granted, 2001 WL 238162, at *1 (D.C. Cir. Feb. 23, 2001) (per curiam).

6

NIH's administrative appeal regulation at 45 C.F.R. ¶ 5.34 provides:

> a) Right of appeal. You have the right to appeal a partial or full denial of your FOIA request. To do so, you must put your appeal in writing and send it to the review official identified in the denial letter. You must send your appeal within 30 days from the date you receive that letter or from the date you receive the records released as a partial grant of your request, whichever is later.

Id.

The decision in Fisher v. United States Dep't of Justice, 07-2273, 2008 U.S. Dist. LEXIS 38925 (D.N.J. May 9, 2008), is instructive in interpreting this provision.  In Fisher, the plaintiff appealed the Department of Justice's ("DOJ") denial of his FOIA request by mailing a copy of his appeal 56 days after DOJ issued its decision.  DOJ, however, did not receive the appeal until 10 days after the 60-day deadline had past.  The district court ruled that the plain language of DOJ's FOIA administrative appeal regulation, found at 28 C.F.R. § 16.9(a), "provides that an appeal must be received within sixty days of the date of the letter denying the request[,]" adding, "Plaintiff bears the burden of producing evidence of a proper appeal." Fisher, 2008 U.S. Dist. LEXIS 38925, at *9 (citing Schoenman v. FBI, No. 04-2202, 2006 WL 1582253, at *11 (D.D.C. Jun. 5, 2006); Bestor v. CIA, No. 04-2049, 2005 WL 3273723, at *4 (D.D.C. Sept. 1, 2005)).  Because DOJ received an untimely appeal, the Fisher Court held that the plaintiff had failed to exhaust his

administrative remedies and it "therefore decline[d] to exercise jurisdiction over his claim." Fisher, 2008 U.S. Dist. LEXIS 38925, at *10.  See id. at 7 ("the requester can seek judicial review only after he has exhausted his administrative remedies by timely filing an appeal and awaiting its outcome").

Here, it is clear that plaintiff filed no timely administrative appeal of NIH's February 20, 2008 determination. NIH did not hear from plaintiff on this matter until August 21, 2008, see Maloney Decl., ¶¶ 5-8, so plaintiff clearly did not send an administrative appeal to NIH within 30 days of the February 20, 2008 determination.

Under such circumstances, plaintiff failed to timely exhaust its administrative remedies with respect to this request. Therefore, its request for documents and materials consisting of investigative records regarding three specifically named individuals should be dismissed.

  B. NIH Properly Refused to Confirm or Deny the
     Existence of Certain Requested Records.

Even if plaintiff's August 21, 2008 letter can be considered a proper new request for information on the three specifically identified individuals, and with respect to the request for a confidentiality agreement concerning an alleged investigation of a specifically named individual, NIH properly refused to confirm or deny the existence of any responsive records.  NIH averred that being required to acknowledge whether it had such records

was a clearly unwarranted invasion of the personal privacy of the individuals named in plaintiff's two FOIA requests.   Cornell Decl., ¶ 10.

Under FOIA, this is known as a *Glomar* response.   See, e.g., Larson v. Dep't of State, 565 F.3d 857, 661 (D.C. Cir. 2009); Jefferson v. Department of Justice, Office of Professional Responsibility, 284 F.3d 172, 176 (D.C. Cir. 2002) [Jefferson]. A *Glomar* response is when an agency refuses to confirm or deny whether it has records on an individual who is the target of a FOIA request.   The response is in recognition of the fact that sometimes even admitting the existence of records may cause an unwarranted invasion of that person's privacy.   Jefferson, at 176-77; Phillippi v. CIA, 546 F.2d 1009, 1014-15 (D.C. Cir. 1976) (which concerned the existence of records regarding a ship named *Hughes Glomar Explorer* ).

The Supreme Court addressed this very issue in U.S. Dept. of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 773 (1989) [Reporters Committee for Freedom of the Press]. In that case, a news organization sought the criminal history or rapsheet of an individual.   Id. at 757.   The FBI refused to confirm nor deny the existence of any records.   Id.   The Supreme Court held that revealing the existence of a rapsheet implicates the privacy interests of third parties about whom FBI receives a FOIA request.   Id. at 762.   Moreover, the Court noted the

existence of the Privacy Act and its prohibition on revealing the identities of individuals whose names and identifying information are held in governmental computer databases. Id. at 766. Thus, those records were held exempt from disclosure.

More recently, in Jefferson the Court of Appeals from this Circuit revisited the *Glomar* response when issued by an entity that conducts both law enforcement and non-law enforcement activities. In that case, records in DOJ's Office of Professional Responsibility ("OPR") were at issue, and the Court of Appeals made clear that a *Glomar* response may be appropriate when dealing with records compiled in the course of law enforcement investigations concerning a specifically named individual. Id., 284 F.3d at 179.

Here, plaintiff's request is comparable to those at issue in Reporters Committee and Jefferson. Plaintiff seeks information that will reveal whether specifically named individuals have been the subject of law-enforcement inquiry concerning alleged wrongdoing in the nature of possible violations of the Animal Welfare Act. Cornell Decl., ¶ 10; see Maloney Decl., ¶¶ 13, 27. Plaintiff provided no evidence that NIH, or any other federal governmental agency, had publicly acknowledged the existence of any investigation relating to these specifically named individuals. Therefore, in order to protect the privacy of these individuals, and consistent with the Supreme Court's

10

decision in <u>Reporters Committee for Freedom of the Press</u>, NIH is entitled to neither admit nor deny the existence of any records pertaining to these individuals.

Moreover, NIH also relied upon Exemptions 6 and 7(C) to withhold any records it might have.  Because plaintiff never provided to NIH a privacy waiver or written permission for the agency to release information about the specifically named individuals, NIH was correct to presume that this information was exempt from disclosure.  <u>See</u> <u>infra</u> at 17-27 (discussing Exemptions 6 & 7(C)).

For the foregoing reasons, NIH is entitled to summary judgment on its decision to issue plaintiff a *Glomar* response.

> II.  Pursuant To Exemption 4, NIH Correctly Withheld
>      <u>Certain Confidential Commercial Information.</u>

Exemption 4 of the FOIA was drafted by Congress to safeguard important interests of both the government and submitters of information.  It ensures that federal agencies will continually be able to obtain necessary commercial and financial information from outside the government and that they will be able to operate efficiently and effectively.  <u>See</u> <u>Critical Mass Energy Research Project</u> v. <u>NRC</u>, 830 F.2d 278 (D.C. Cir. 1987) ("<u>Critical Mass I</u>"), <u>vacated on other grounds</u>, <u>Critical Mass Energy Project</u> v. <u>NRC</u>, 975 F.2d 871 (D.C. Cir. 1992) ("<u>Critical Mass II</u>"), <u>cert</u>. <u>denied</u>, 507 U.S. 984 (1993).  The exemption also protects those who submit such information from the competitive disadvantages

that would result from disclosure.  Critical Mass I, 830 F.2d at 282; United Technologies Corp. V. U.S. Dep't of Defense, 601 F.3d 557, 563 (D.C. Cir. 2010).  To qualify for protection under Exemption 4, the requested records must consist of:  (1) commercial or financial information, that is (2) obtained from a person,[1] and (3) is privileged or confidential.  See, e.g., 45 C.F.R. § 5.65; United Technologies Corp., 601 F.3d at 563; Gulf & Western Indus., Inc. v. United States, 615 F.2d 527, 529 (D.C. Cir. 1980) ("Gulf & Western").

With regard to the first part of the test, courts have broadly construed the term "commercial" as used in Exemption 4. See e.g., Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983) ("Public Citizen"); accord Baker & Hostetler LLP v. U.S. Dep't of Commerce, 473 F.3d 312, 319-20 (D.C. Cir. 2006).  In Public Citizen, the D.C. Circuit held that the term "commercial" should be given its "ordinary" meaning, and specifically rejected the view that in order to qualify for Exemption 4 protection the information had to "reveal basic commercial operations."  Id. at 1290.  Instead, the Court held

---

[1]  The phrase "obtained from a person" naturally includes information obtained from corporations and a wide range of other entities, as well.  See 5 U.S.C. § 551(2) ("'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency"); 45 C.F.R. § 5.65(b)(2); Nadler v. FDIC, 92 F.3d 93, 95 (2d Cir. 1996); Allnet Communications Servs v. FCC, 800 F. Supp. 984, 988 (D.D.C. 1992), aff'd No. 92-5351 (D.C. Cir. May 2, 1994).

that records are commercial for Exemption 4 purposes if the submitter has a "commercial interest" in them.  Id. at 1290; see also, e.g., American Airlines v.  National Mediation Bd., 588 F.2d 863, 870 (2d Cir. 1978) ("'commercial' surely means [information] ... dealing with commerce").

Not only, as shown below, do the withheld records constitute "commercial or financial" information obtained from a person, they also qualify as "confidential" under the tests announced by the D.C. Circuit for FOIA Exemption 4.  In National Parks & Conservation Ass'n v. Morton, 498 F.2d 765 (D.C. Cir. 1974) ("National Parks"), the Court of Appeals adopted a two-pronged test for determining whether commercial or financial information is "confidential" under Exemption 4:

> [C]ommercial or financial matter is "confidential" for purposes of the exemption if disclosure of the infor-mation is likely to have either of the following effects:  (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.

Id. at 770.

As Ms. Maloney explains, under NIH's regulation, found at 45 C.F.R. § 5.65(b)(4):

> Information is 'confidential' if: (I) Disclosure may impair the government's ability to obtain necessary information in the future; (ii) Disclosure would substantially harm the competitive position of the person who submitted the information; (iii) Disclosure would impair other government interests, such as program effectiveness and compliance; or
> (iv) Disclosure would impair other private interests,

13

> such as an interest in controlling the availability of intrinsically valuable records, which are sold in the market by their owner.

Maloney Decl., ¶ 20.

In its subsequent <u>en</u> <u>banc</u> decision in <u>Critical Mass II</u>, the D.C. Circuit reaffirmed the two-pronged test in <u>National Parks</u>, but confined it to the category of cases to which it was first applied, namely, those in which a FOIA request is made for financial or commercial information a person was obliged to furnish the Government.  <u>Critical Mass II</u>, 975 F.2d at 872.  The Court of Appeals in <u>Critical Mass II</u> also recognized another basis on which materials may be withheld under Exemption 4:

> We conclude that any financial or commercial information provided to the Government on a voluntary basis is "confidential" for the purposes of Exemption 4 if it is of the kind that would customarily not be released to the public by the person from whom it was obtained.

<u>Id</u>. at 879.  In doing so, the Court applied a "categorical" approach to protect voluntarily submitted information that is intended to greatly simplify the application of Exemption 4 in a significant number of cases.  <u>Id</u>. at 879.

Thus, the rule in this Circuit is that confidential commercial or financial information obtained from a person can be withheld under Exemption 4 for any <u>one</u> of the following reasons: (1) if it is voluntarily provided by the submitter and is not of the type customarily released by the submitter; <u>or</u> (2) if it is compelled to be provided to the Government, it can be withheld as

14

exempt if its disclosure would (a) impair the Government's ability to obtain the necessary information in the future, (b) imperil the governmental interest in administrative efficiency, or (c) cause substantial harm to the competitive position of the person from whom the information was obtained.  Critical Mass II, 975 F.2d at 878-79.

NIH withheld information under Exemption 4 that was voluntarily submitted to the agency's Office of Laboratory Animal Welfare ("OLAW").  As Ms. Maloney explains:

> OLAW investigated the allegations because the OLAW animal assurance applies to Auburn University's animal research program, and once animal research program-related allegations are raised to OLAW, OLAW needs to investigate.  When institutions receive an Assurance, they agree to self-report any non-compliance with the PHS Policy on the Humane Care and Use of Laboratory Animals (PHS Policy) with respect to PHS funded activity, which includes compliance with the Animal Welfare Act.  Institutions are required by the PHS Policy to provide requested information and records to OLAW.  Sometimes, institutions also voluntarily self-report incidents involving non-PHS funded activity to demonstrate their commitment to proper oversight of all animal activities.

Id. at ¶ 21.  OLAW does not have the authority to force institutions to provide documents.  Id.  Therefore, all the documents at issue from Auburn University were voluntarily provided.  Id.; Declaration of Patricia M. Mantoan ("Mantoan Decl."), Ex. 4.

Under the Court of Appeals' decision in Critical Mass II, when Exemption 4 is applied to information voluntarily submitted

to the government, the only question is whether the information is of the type customarily released by the submitter.  _Id._, 975 F.2d at 878-79.

Here, the submitter, Auburn University, has informed NIH that the information at issue would not customarily be provided to the general public.  Mantoan Decl., Ex. 4.  According to Auburn University:

> Release of the documents in question could cause harm to Auburn University and/or our employees.  First, and most importantly, is the concern for the safety of our students, staff, faculty and administration.  Auburn University has received threats of personal harm to individuals that are associated with animal research at our institution.  This information could potentially fuel the activities of extremists to escalate from threats to actual acts of violence against our students and employees.  In addition to physical harm, if such information were misunderstood or misinterpreted it could cause harm to the reputation of the individuals involved, and possibly to the institution as well.

_Id_.  Additionally, Auburn University noted that the documentation identifies the person who made complaints about animal welfare in connection with research being performed at the University, and disclosing information that could identify this person could result in retribution against the complainant or deter other similarly situated individuals from raising complaints.  _Id_.

Finally, Auburn University informed NIH that, like other institutions, the university competes for research funds and release of research proposals, protocols and other similar documents could cause commercial harm to the University.  _Id_.;

16

Maloney Decl., ¶ 6.

With respect to the government's interest in withholding this information, Ms. Maloney points out that:

> These records are also protected from release under the "program effectiveness" prong of Exemption 4. As noted above, OLAW relies upon the institutions to cooperate with their investigations. OLAW needs the information from the institutions to be accurate and timely in order to fulfill its mission. Although OLAW could suspend or revoke an Assurance or could recommend that NIH halt funding to a non-compliant institution, such an action would be acrimonious and would not result in relevant, accurate information being provided. If institutions are unwilling to provide the information and documentation OLAW needs, the effectiveness of the program is at risk.

Maloney Decl., ¶ 23.

Because release of the withheld information would cause competitive harm to Auburn University, and is not the type of information customarily disclosed by this entity, and would harm NIH's ability to effectively carry out its program of ensuring that animal research program-related allegations are raised to OLAW and investigated, see Maloney Decl., ¶¶ 21-23, disclosure of this information would cause the very harm Exemption 4 was designed to avoid. Consequently, NIH correctly withheld the information under Exemption 4.

> III. Pursuant to Exemption 6, NIH has Properly Withheld Information the Disclosure of Which Would Constitute a Clearly Unwarranted Invasion Of Personal Privacy.

Exemption 6 of the FOIA provides for the withholding of matters contained in "personnel and medical files and similar

17

files the disclosure of which would constitute a clearly

unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

In a definitive opinion on the meaning of the term "similar

files," the Supreme Court held that Exemption 6 "'[was] intended

to cover detailed government records on an individual which can

be identified as applying to that individual.'"  Department of

State v. Washington Post Co., 456 U.S. 595, 602 (1982) (quoting

H.R. Rep. No. 1497, 89th Cong., 2d Sess. 11, reprinted in 1966

U.S. Code Cong. & Admin. News 2428); New York Times Co. v. NASA,

920 F.2d 1002, 1005 (D.C. Cir. 1990 (en banc).

In Department of State v. Washington Post Co., 456 U.S. 595

(1982), the Supreme Court held:

> '[T]he protection of an individual's right of privacy'
> which Congress sought to achieve by preventing 'the
> disclosure of [information] which might harm the
> individual,' H.R. Rep. No. 1497, supra, at 11, surely
> was not intended to turn upon the label of the file
> which contains the damaging information.

Id. at 601.  Thus, even information which is not specifically

located in "personnel files" comes within the penumbra of

Exemption 6.  Indeed, the Supreme Court clarified that all

information that "applies to a particular individual" meets the

threshold requirement for Exemption 6.  Id. at 599-603, 601;

Lepelletier v. FDIC, 164 F.3d 37, 46 (D.C. Cir. 1999) ("The

Supreme Court has interpreted the phrase 'similar files' to

include all information that applies to a particular

individual.").  This broad construction of "similar files" was

18

necessary in view of Congress' primary purpose in enacting Exemption 6, which was "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."   Washington Post Co., 456 U.S. at 599.

The Supreme Court has found that "[i]ncorporated in the 'clearly unwarranted' language is the requirement for . . . [a] 'balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information.'" Lepelletier, 164 F.3d at 46, citing U.S. Dep't of Defense v. FLRA, 964 F.2d 26, 29 (D.C. Cir. 1992) (citations omitted).   In determining how to balance the private and public interests involved, the Supreme Court has sharply limited the notion of "public interest" under the FOIA:   "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" Lepelletier, 164 F.3d at 46, quoting FLRA, 510 U.S. at 497; see also Reporters Comm. for Freedom of the Press, 489 U.S. at 773.

In this case, NIH has withheld under Exemption 6 names and other identifying personal information of the individual who made a complaint or raised concerns about animal care and use, individuals mentioned in an animal welfare investigation file,

individuals whose research proposal was unfunded by a non-federal organization, individuals associated with animal welfare research who are identified in an investigatory file, the target of an animal welfare complaint, and members of a subcommittee who investigated an animal welfare complaint and certain personal health information.  Maloney Decl., Ex. 8 at 1-20.

As the information in question can "be identified as applying to [a particular] individual," Washington Post Co., 456 U.S. at 602, the information is contained in files which clearly satisfy the threshold requirement of Exemption 6 as defined by the Supreme Court.

Having established that the withheld information meets the threshold requirement of Exemption 6, a determination must then be made as to whether disclosure would constitute a "clearly unwarranted invasion of personal privacy."  This requires a balancing of the public interest in disclosure against the individual privacy interest which would be invaded by release of the information. See Reporters Committee for Freedom of the Press, 489 U.S. at 773; U.S. Department of the Air Force v. Rose, 425 U.S. 352, 372 (1976).  The limiting language, "clearly unwarranted invasion of personal privacy," strikes "a proper balance between protection of an individual's right of privacy and preservation of the public's right to government information by excluding those kinds of files the disclosure of which might

20

harm the individual." <u>U.S. Dep't of the Air Force</u> v. <u>Rose</u>, 425 U.S. at 372 (citations omitted).

The first step in assessing the propriety of information withheld under Exemption 6 requires an identification of the privacy interest at issue. <u>See Reporters Committee for Freedom of the Press</u>, 489 U.S. at 763. In the usual case, the Court looks to see whether the information requested, if released, would violate a recognized substantial privacy interest of the subject of such information. <u>See Consumers Checkbook Study for the Services</u> v. <u>U.S. Dep't of Health and Human Services</u>, 554 F.3d 1046, 1050 (D.C. Cir. 2008); <u>Nat'l Ass'n of Retired Fed. Employees</u> v. <u>Horner</u>, 879 F.2d 873, 874 (D.C. Cir.1989).; <u>Ripskis</u> v. <u>Dep't of Housing and Urban Development</u>, 746 F.2d 1, 3 (D.C. Cir. 1984).

Here there can be no question that substantial privacy interests are at stake. As Ms. Maloney explained: "[I]ndividuals who engage in or who are associated with animal research are frequently the target of harassment and threats, and at times actual acts of violence." Maloney Decl., ¶ 26. "Revealing the withheld information could reasonably be expected to cause potential harassment or misuse of the information . . . ." <u>Id</u>.

Ms. Maloney's concerns are well founded. Auburn University informed NIH that it has "received threats of personal harm to individuals that are associated with animal research at our

institution." Mantoan Decl., Ex. 4. In <u>United States</u> v. <u>Fullmer</u>, 584 F.3d 132 (3d Cir. 2009), the Third Circuit upheld the convictions of six individuals associated with an animal rights organization who were convicted of interstate stalking and using a telecommunications devise to abuse, threaten and harass individuals associated with a research corporation whose laboratories used animals as test subjects for products being brought to market. In <u>Novartis Vaccines and Diagnostics Inc.</u> v. <u>Stop Huntington Animal Cruelty USA, Inc.</u>, 50 Cal. Rptr. 3rd 27 (Cal. App. 1dt Dist. 2006), the Court upheld injunctive relief against an organization that targeted the employees of a company involved in animal research.

The North American Animal Liberation Press Office is an organization

> founded to communicate the actions, strategies, and philosophy of the animal liberation movement to the media and the public. Many of these actions are illegal under a current societal structure that fails to recognize the rights of non-human animals to live free of suffering, but validates and promotes the "right" of industries to do whatever they want to animals for profit or research. Within these conditions, those in the underground working for animal liberation often cannot speak out directly. Nevertheless, their actions and message is urgent and deserve to be heard and understood.

<u>See</u> http://animalliberationpressoffice.org/Background.htm On its website the Press Office has a "Guide to Direct Action", which includes a list of "possible targets", including people affiliated with animal research laboratories and the Guide has a

link to all such known laboratories.  See

http://animalliberationpressoffice.org/essays/2010_guide_da.htm

The foregoing, which constitutes but a few examples of what can

be found on the Internet under the subject of "threats to animal

researchers", amply demonstrates that such researchers have

substantial privacy interests in the association of their

identities with the area of animal research, given the

possibility for being targeted for harassment.

Once a privacy interest has been found to exist, a

determination regarding whether information has been properly

withheld necessitates a balancing of the individual's right to

privacy against the public's right of access to information in

government files.  See, e.g., Reporters Committee for Freedom of

the Press, 489 U.S. at 774.  If a document invades a third

party's privacy, and does not contain "official information"

shedding light on government functions, it may be withheld under

Exemption 6.  Id.

Here, the disclosure of personal information about the

individuals whose identities are being protected is simply not

relevant to the public's understanding of NIH's conduct of its

business.  Invocation of Exemption 6 to protect this private

information is consistent with the Supreme Court's view of the

FOIA as stated in Reporters Committee for Freedom of the Press:

> Other portions of the FOIA itself bolster the conclu-
> sion that disclosure of records regarding private citi-

23

zens, identifiable by name, is not what the framers of FOIA had in mind.

489 U.S. at 756.

The Mantoan Declaration shows that NIH has released its final decision about the animal welfare investigations it conducted regarding Auburn University, redacting only the names or identifying information about complainants, targets, or witnesses mention in these documents. Id. at ¶ 4 & Ex. 1. The Maloney Declaration states that the withheld information "would reveal nothing or very little about the operations or activities of HHS, or any component thereof." Mahoney Decl., ¶ 26. Accordingly, there is no public interest in the release of the information withheld under Exemption 6. Id.

The final step in the analysis is to weigh the privacy and public interests. In Public Citizen Health Research Group v. U.S. Dep't of Labor, 591 F.2d 808 (D.C. Cir. 1978), the Court of Appeals stated:

> Since this a balancing test, any invasion of privacy can prevail, so long as the public interest balanced against it is sufficiently weaker. The threat to privacy thus need not be patent or obvious to be relevant. It need only outweigh the public interest.

591 F.2d at 809. Here, as shown above, there can be no dispute that there is a substantial privacy interest on one side of the balancing equation. When this interest is balanced against a nonexistent public interest in the personal information, NIH's determination to withhold the information must clearly prevail.

24

Indeed, as this Circuit has repeatedly observed, "something, even a modest private interest, outweighs nothing every time." National Ass'n of Retired Federal Employees v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989), cert. denied, 494 U.S. 1078 (1990); accord Beck v. Dep't of Justice, 997 F.2d 1489, 1494 (D.C. Cir. 1993).

Because, as established above, there are substantial privacy interests to be protected in the information withheld, and there is no public interest in the disclosure of the information, the determinations by NIH to protect this information under Exemption 6 should be affirmed.

IV. Pursuant to FOIA Exemptions 7(C) and 7(D), NIH Properly Withheld Law Enforcement Information The Disclosure Of Which Would, Respectively, Constitute an Unwarranted Invasion of Privacy, and Disclose Confidential Sources.

In order to invoke any of the subsections of Exemption 7, an agency must demonstrate as a threshold matter that the records were "compiled for law enforcement purposes." 5 U.S.C. § 552(b). To satisfy this requirement, it must show that the records at issue are related to the enforcement of federal laws and that the law enforcement activity was within the law enforcement duty of an agency. See Tax Analysts v. IRS, 294 F.3d 71, 78 (D.C. Cir. 2002) (citing Pratt v. Webster, 673 F.2d 408 (D.C. Cir. 1982)).

It is readily apparent that the records for which Exemption 7 was cited constitute records "compiled for law enforcement purposes." The Maloney Declaration explains that the records

25

concern "investigations of alleged animal research or Animal Welfare Act violations and includes information provided by whistleblowers. Id. at ¶¶ 27 & 29, 31-33. NIH's OLAW "is responsible for issuing assurances for animal research and investigating allegations of violations of those assurances as well as allegations of violations of the Animal Welfare Act by institutions receiving PHS funds for research." Id. at ¶ 13. The Maloney Declaration clearly demonstrates that the responsive information here meets the threshold requirement of Exemption 7.

Because this information qualifies as Exemption 7 information, the next consideration is whether it is protected from release by Exemptions 7(C) and 7(D).

A. Exemption 7(C)

Exemption 7(C) exempts from mandatory disclosure under the FOIA information compiled for law enforcement purposes when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5. U.S.C. § 552(b)(7)(C). A determination regarding whether information has been properly withheld under this exemption necessitates a balancing of the individual's right to privacy against the public's right of access to information in government files. Sussman v. United States Marshals Serv., 494 F.3d 1106, 1115 (D.C. Cir. 2007); Davis v. Department of Justice, 968 F.2d 1276, 1281 (D.C. Cir. 1992). Where a legitimate privacy interest is implicated, the

requester must "(1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake, and (2) show the information is likely to advance that interest." Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 172 (2004).  If a document invades a third party's privacy and sheds no light on government functions, it may be withheld under Exemption 7(C). See, e.g., Reporters Committee for Freedom of the Press, 489 U.S. at 774.

In this case, Exemption 7(C) was invoked to protect the names and other identifying personal information of the individual who made a complaint or raised concerns about animal care and use, individuals mentioned in an animal welfare investigation file, individuals whose research proposal was unfunded by a non-federal organization, individuals associated with animal welfare research who are identified in an investigatory file, the target of an animal welfare complaint, and members of a subcommittee who investigated an animal welfare complaint and certain personal health information.  Maloney Decl., Ex. 8 at 1-20.  NIH carefully balanced the privacy interests at stake against the public interest in disclosure and concluded that the privacy interests outweighed any interest in disclosure because disclosure would not shed light on the operations and activities of NIH.  Id. at ¶¶ 26-33.

This type of information has traditionally been protected by the Courts, because its release would reveal nothing about the operations and activities of the government and could subject these individuals to harassment in the conduct of the official duties and in their private lives.  See, e.g., Nation Magazine, 71 F.3d at 896 (D.C. Cir. 1995).  The same result is warranted here.

        B. Exemption 7(D)

Exemption 7(D) of the FOIA exempts from mandatory disclosure law enforcement records the release of which "could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency ...."  5 U.S.C. § 552(b)(7)(D).  In this case certain information was withheld to protect the identities of confidential informants who provided statements under circumstances which created an implied promise of confidentiality.  Maloney Decl., ¶¶ 28-33.

In Department of Justice v. Landano, 508 U.S. 165 (1993), the Supreme Court crafted a case-specific inquiry to determine the existence of confidentiality under Exemption 7(D), replacing the previous presumption of confidentiality for sources in criminal cases.  The Supreme Court held that a source need not have an expectation of "total secrecy" to be deemed a confidential source and then explained that a "source is confidential within the meaning of Exemption 7(D) if the source

28

provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." <u>Id</u>. at 172.

In this case, with respect to the sources, each spoke under an implied assurance of confidentiality. Maloney Decl., ¶ 29. As mentioned above, the Supreme Court in <u>Landano</u> requires a fact-specific analysis to be undertaken with respect to any implied assurance of confidentiality. <u>Id</u>., 508 U.S. at 180.

Here, information was withheld "to protect the identities of whistleblowers in records that were compiled to conduct an animal welfare investigation of an alleged violation by a particular researcher." Maloney Decl., ¶ 29. "The whistleblower's identity needs to remain confidential for his or her own protection as well as to serve as a message to others who might want to report allegations of abuse in animal research that their identity will be protected." <u>Id</u>. at ¶ 31. An implied promise of confidentiality under such circumstances seems eminently reasonable. <u>See</u> <u>Canning</u> v. <u>Dep't of Justice</u>, 567 F. Supp.2d 104, 112 (D.D.C. 2008) )("In this case, the crime of government corruption, while not inherently violent, gives rise to an implied assurance of confidentiality." "A corruption investigation necessarily involves interviewing employees inside the allegedly corrupt office. Providing potentially damaging information about one's employer might place the jobs and

29

livelihoods of witnesses in danger and thus gives rise to an assurance of confidentiality."); Schrecker v. Dep't of Justice, 74 F. Supp.2d 26, 35 (D.D.C. 1999) (confidentiality inferred where crimes being investigated were passport fraud and contempt of Congress).

Exemption 7(D) was crafted to "prevent the FOIA from causing the 'drying up' of sources of information in criminal investigations," e.g., Shaw v. FBI, 749 F.2d 58, 61 (D.C. Cir. 1984), and to prevent interference with the cooperative arrangement between individual sources of information vital to the effective functioning of law enforcement activities. See, e.g., Lesar v. Department of Justice, 636 F.2d 472, 491 (D.C. Cir. 1980). Because NIH invoked Exemption 7(D) in this case for exactly these reasons, its use is clearly appropriate and should be upheld.

V.   Plaintiff's Claim Under the APA Should be
     Dismissed or Summary Judgment Granted to NIH.

Plaintiff is asserting an APA claim against NIH for its use of confidentiality agreements during investigations, because it wishes to obtain records from Auburn University, a state university.  Compl., ¶¶ 15, 17, 19-20, 27.  Because state access laws and the FOIA provide adequate remedies to plaintiff to obtain records, judicial review under the APA is not available.

The Declaration of Suzanne J. Servis ("Servis Decl."), Director of NIH's Office of Management Assessment ("OMA"), explains OMA's role in investigations and its use of

confidentiality agreements.  Servis Decl., ¶¶ 6-7.  Within NIH,

OMA's responsibilities include, among other matters, the review

of allegations of misuse of NIH grant and contract funds,

violations of HHS and NIH grant or contract regulations or policy

that are not directly tied to misuse of funds, and issues

referred to OMA by the HHS Office of Inspector General ("OIG")

when prosecutive or civil action has been declined or when the

OIG plans no further investigation.  Servis Decl., ¶ 3.  When OMA

receives an allegation, OMA assesses it and decides whether a

review is warranted and who should conduct the review.  Id. at

¶ 4.  Although OMA conducts most reviews with staff from OMA's

Division of Program Integrity ("DPI"), OMA refers some matters to

other offices within NIH or to other agencies within HHS, such as

the OIG.  Id.  In particular, when OMA receives an allegation of

noncompliance with HHS Regulations or NIH Policies concerning the

use of laboratory animals in research by a grantee institution,

OMA refers the allegation to the OLAW, Office of Extramural

Research ("OER"), NIH.  Id.

When OMA decides that an allegation concerning a recipient

of NIH grant funds warrants OMA's review, it may proceed with

such review in one of several ways.  Servis Decl., ¶ 5.  At

times, OMA may send its DPI staff to the grantee institution's

location to conduct an on-site review.  Id.  On other occasions,

OMA may arrange with the grantee institution to have an

independent audit of the allegations conducted by the grantee
institution's internal auditors in accordance with the relevant
standards of the Institute of Internal Auditors, and provide the
audit report and findings to OMA for review.  Id.  In any case,
it may be necessary for OMA to share with the grantee institution
certain confidential materials, including copies of draft and
final advisory reports, regarding OMA's review.  Id.

When it becomes necessary for OMA to share confidential
materials with a grantee institution, including a grantee
institution that is a state university, OMA shares such
information subject to a confidentiality agreement.  Servis
Decl., ¶ 6.  The confidentiality agreement provides that the
grantee institution agrees to maintain the confidentiality of the
materials with which it will be entrusted, provided that the
obligation of confidentiality does not apply to information
already in the public domain or received by the grantee
institution from another party not under obligation of
confidentiality.  Id.  In addition, pursuant to a confidentiality
agreement, the grantee institution agrees that it will (a) not
disclose, copy, or discuss the confidential materials or their
contents or any portion thereof except to individuals who need to
know the information in connection with the purpose for which OMA
has made the information available to the grantee institution;
(b) take all reasonable precautions to ensure that the

32

confidential materials are not inadvertently disclosed to anyone except to individuals who have a need to know the information in connection with the purpose for which OMA has made the information available to the grantee institution; and (c) cooperate fully with any U.S. Government investigation of any unauthorized disclosure of the confidential materials.  Id.  A grantee institution's obligations under a confidentiality agreement do not terminate.  Id.  A template example of the confidentiality agreement that has been used by OMA since 1996 is attached to the Servis Declaration.  Servis Decl., Ex. 1.

A confidentiality agreement executed by OMA and a grantee institution describes the terms that apply to the confidential materials and their contents provided by OMA to the grantee institution.  Servis Decl., ¶ 7.  As a result, a confidentiality agreement would not apply to materials that the grantee institution, including a state university, generated itself that predate, or do not incorporate or otherwise reference, the confidential materials provided to the grantee institution by OMA or their contents.  Id.

The APA authorizes judicial review only when the challenged agency action is final and when there is no other adequate remedy. 5 U.S.C. §§ 703-704; see also Bowen v. Massachusetts, 487 U.S. 879, 903 (1988) (APA does not provide additional remedies where adequate remedies are already provided).  In this case,

there are adequate remedies elsewhere, outside of the APA.

For records that are generated by a state university that do not incorporate or reference the confidential materials provided by OMA during an investigation, and therefore, would not be subject to the OMA confidentiality agreement, the appropriate remedy is found in state law.  In the sample agreement attached to the Servis Declaration, there is no reference to state access laws and any instruction to state universities on how to interpret or apply their state laws.  See Servis Decl., Ex. 1.

Plaintiff is improperly invoking federal court jurisdiction to collaterally attack a decision made by Auburn University under the Alabama Open Records Act.  Plaintiff is raising issues that concern Auburn University's responses to plaintiff's requests under the Alabama Open Records Act.  Compl. ¶¶ 15, 17, 19-20.  Auburn's interpretation of its own state laws is a matter of state law, and NIH takes no position on Auburn University's interpretation of state law.  The appropriate remedy for plaintiff is to challenge Auburn's disclosure decision, regarding state-generated records, under the Alabama Open Records Act, Alabama Code § 36-12-40.  See, e.g., Chambers v. Birmingham News Co., 552 So.2d 854, (Ala. 1989) (affirming trial court's order, directing state agency to disclose records under the Alabama Open Records Act).

Moreover, to the extent that OMA provided to a state

34

university confidential materials covered by the OMA confidentiality agreement, such materials would be federal records subject to the Freedom of Information Act.  Courts have uniformly declined jurisdiction over APA claims that sought remedies made available by the FOIA.  E.g., Feinman v. FBI, 713 F. Supp.2d 70, 76 (D.D.C. 2010) (citing relevant case law).  The FOIA provides that "each agency, upon *any* request for records which (I) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, *shall* make the records promptly available to any person," subject to certain exceptions, 5 U.S.C. § 552(a)(3)(A) (emphases added), and nine enumerated exemptions.  Feinman, 713 F. Supp.2d at 77.  The statute also confers upon this Court "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." Id. (quoting 5 U.S.C. § 552(a)(4)(B)).

Because state access laws and the FOIA provide adequate remedies to plaintiff to obtain state-general records or federal-generated records, the APA does not authorize judicial review in this case.

Nonetheless, even if this Court concludes that APA jurisdiction may lie here, then NIH is entitled to summary judgment on plaintiff's APA claim.

Under the APA standard of review, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, id. § 706(2)(C), or "without observance of procedures required by law," id. § 706(2)(D). The scope of review, however, is "narrow," and "the court is not to substitute its judgment for that of the agency." Motor Vehicle Mfgr's Ass'n v. State Farm Mutual Auto Insurance Co., 463 U.S. 29, 43 (1983); see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). The arbitrary and capricious standard is "[highly deferential," and "presumes the validity of agency decisions." AT&T Corp. v. FCC, 220 F.3d 607, 616 (D.C. Cir. 2000).

Here, the Servis Declaration explains that when OMA must share confidential materials with a grantee institution like Auburn University, a confidentiality agreement is used to ensure that confidential information given by OMA remains confidential. Service Decl., ¶¶ 5-7. Any other result would put at risk NIH's ability to carry out a full and complete investigation. There is simply nothing arbitrary or capricious or in violation of law with respect to any confidentiality agreement NIH uses with grantee institutions. If dismissal is not appropriate for Claim III, summary judgment surely is.

36

**CONCLUSION**

WHEREFORE, for all of the reasons set forth above, defendant NIH respectfully submits that this motion to dismiss in part and for summary judgment should be granted.

Respectfully Submitted,


RONALD C. MACHEN JR.
D.C. BAR # 447889
United States Attorney
for the District of Columbia

RUDOLPH CONTRERAS
D.C. BAR # 434122
Chief, Civil Division


By: ___/s/_____
MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. – Civil Division
Washington, D.C. 20530
(202) 514-7226
Marina.Braswell@usdoj.gov

37

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
PEOPLE FOR THE ETHICAL         )
TREATMENT OF ANIMALS           )
                              )
          Plaintiff,           )
                              )
          v.                   )   Civil No. 10-1818 (JDB)
                              )
NATIONAL INSTITUTES OF HEALTH  )
DEPARTMENT OF HEALTH AND       )
HUMAN SERVICES,                )
                              )
          Defendant.           )
_____)

## ORDER

Upon consideration of defendant National Institutes of Health's motion to dismiss in part and for summary judgment, of all the papers filed in support of and in opposition to that motion, and of the entire record, and it appearing to the Court that the granting of defendant's motion would be just and proper, it is by the Court this _____ day of _____, 2011,

ORDERED that defendant National Institutes of Health's motion to dismiss in part and for summary judgment be, and it hereby is, granted; and it is further

ORDERED that this case be, and it is, dismissed with prejudice.

_____
UNITED STATES DISTRICT COURT