UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civ No. 10-1818 (ABJ) |
| NATIONAL INSTITUTES OF HEALTH DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff People for the

Ethical Treatment of Animals ("PETA") hereby moves for partial summary judgment in this case

under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, on the grounds that, with

respect to the "confidentiality agreement" being withheld by defendant National Institutes of

Health ("NIH"), there is no genuine issue of material fact, and the agency has failed to

demonstrate that this document is exempt from disclosure under any of the nine exemptions to

the FOIA.  As further demonstrated in the accompanying memorandum of law, NIH has also

failed to meet its burden of proof that it may assert a "Glomar response" to refuse to even process

PETA's FOIA request for this document, as well as for other documents that PETA has

requested.

Accordingly, and for the reasons more fully set out in plaintiff's memorandum of law, the

Court should enter summary judgment for PETA with respect to the "confidentiality agreement"

at issue, and it should order NIH to immediately process plaintiff's FOIA request with respect to all other documents covered by plaintiff's July 25, 2007 and August 21, 2008 FOIA requests, and release all non-exempt information and provide a detailed <u>Vaughn</u> index with respect to any information that the agency claims is exempt for disclosure.  In support of this motion and plaintiff's opposition to the government's motion to dismiss and for summary judgment, PETA submits the accompanying memorandum of law, the Declaration of Justin Goodman, Exhibits A - JJ, a Statement of Material Facts As To Which There Is No Genuine Issue, and a response to defendant's statement of material facts.

Respectfully submitted,


__/s/_____
Katherine A. Meyer
(D.C. Bar No. 244301)
Jessica Almy
(D.C. Bar No. 996921)

 Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.  Suite 700
Washington, D.C.  20009
(202) 588-5206

Dated: April 29, 2011                       Counsel for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PEOPLE FOR THE ETHICAL              )
TREATMENT OF ANIMALS,              )
                                   )
             Plaintiff,            )
                                   )
      v.                           )
                                   )      Civ No. 10-1818 (ABJ)
                                   )
NATIONAL INSTITUTES OF HEALTH      )
DEPARTMENT OF HEALTH AND           )
HUMAN SERVICES,                    )
                                   )
             Defendant.            )

**PLAINTIFF'S OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS
AND FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Katherine A. Meyer
(D.C. Bar No. 244301)
Jessica Almy
(D.C. Bar No. 996921)
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.,  Suite 700
Washington, D.C. 20009
(202) 588-5206

Dated: April 29, 2011                    Counsel for Plaintiff

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Laws And Policies Intended To Protect Animals Used In Research. . . . . . . . . . . 3

        1.    The Animal Welfare Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    Health and Human Service's Requirements Governing
                Animal Research. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    Animal Welfare Problems At Auburn University. . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.    Concerns That Dr. Lothrop Left Sick Animals Unattended. . . . . . . . . . . 8

        2.    Concerns About Auburn's Kidney Transplant Experiments. . . . . . . . . . 10

        3.    PETA's Undercover Investigation Of Auburn University. . . . . . . . . . . . 15

    C.    NIH's Efforts To Ensure That The Public Is Unable to Scrutinize What,
        If Any, Measures NIH Has Taken To Investigate And Remedy The Alleged
        Violations Of Law That PETA And Others Have Brought To Its Attention. . . . . 22

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.    DEFENDANT MAY NOT REFUSE TO PROCESS PETA'S FOIA REQUESTS. . . . . 26

    A.    PETA Exhausted Its Administrative Remedies. . . . . . . . . . . . . . . . . . . . . . . . . . 26

    B.    NIH Has Unlawfully Asserted A Glomar Response. . . . . . . . . . . . . . . . . . . . . . 27

    C.    The Public Interest In Disclosure Far Outweighs The Asserted
        Privacy Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        1.    NIH Has Failed To Demonstrate A Viable Personal
                Privacy Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.      There Is A Strong Public Interest In The Requested Records. . . . . . . . . 37

II.    BECAUSE THE AGENCY CANNOT MEET ITS BURDEN OF PROOF THAT
THE "CONFIDENTIALITY AGREEMENT" IT MADE AUBURN SIGN IS
EXEMPT FROM DISCLOSURE, THIS RECORD MUST BE RELEASED. . . . . . . . . 43

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE**

Alliance for the Wild Rockies v. U.S. Dep't of Interior,
      53 F. Supp. 2d 32 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Am. Civil Liberties Union v. U.S. Dep't of Defense,
      828 F.3d 612 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Army Times Publ'g Co. v. Dep't of Air Force,
      998 F.2d 1067 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Beck v. Dep't of Justice,
      997 F.2d 1489 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Boyd v. Criminal Div. Of U.S. Dep't of Justice,
      475 F.3d 381 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Chesapeake Bay Fund, Inc. v.  U.S. Army Corps of Eng'rs,
      722 F. Supp. 2d 66 (D.D.C. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Cohen v. EPA,
      575 F. Supp. 425 (D.D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 38

Ctr. For Auto Safety v. EPA,
      731 F.2d 16 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Dep't of the Air Force v. Rose,
      425 U.S. 352 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Detroit Free Press, Inc. v. U.S. Dep't of Justice,
      73 F.3d 93 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

EPA v. Mink,
      410 U.S. 73 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

FBI v. Abramson,
      456 U.S. 615 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fine v. U.S. Dep't of Energy Office of Inspector Gen.,
      823 F. Supp. 888 (D.N.M. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Getman v. NLRB,
    450 F.2d 670 (D.C. Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 40

Hall v. U.S. Dep't of Justice,
    552 F. Supp. 2d 23 (D.D.C. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

In re Physicians Comm. for Responsible Med. v. Hogan,
    29 Misc. 3d 1220(A), 2010 WL 4536802 (N.Y. Sup. Ct. Nov. 3, 2010). . . . . . . . 35, 37, 39

Int'l Primate Prot. League v. Inst. for Behavioral Research,
    799 F.2d 934 (4th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Jameson v. Jameson,
    176 F.2d 58 (D.C. Cir. 1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Jefferson v. U.S. Dep't of Justice, Office of Prof'l Responsibility,
    284 F.3d 172 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Judicial Watch v. U.S. Dep't of Homeland Sec.,
    598 F. Supp. 2d 93 (D.D.C. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Kurzon v. HHS,
    649 F.2d 65 (1st Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Landmark Legal Found. v. IRS,
    87 F. Supp. 2d 21 (D.D.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Lykins v. U.S. Dep't of Justice,
    725 F.2d 1455 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Milner v. Dep't of Navy,
    131 S. Ct. 1259 (Mar. 7, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

N.C. Network for Animals v. U.S. Dep't of Agric.,
    924 F.2d 1052 (Table) (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Nation Magazine v. U.S. Customs Serv.,
    71 F.3d 885 (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 37, 42

NLRB v. Robbins Tire & Rubber Co.,
    437 U.S. 214 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Novartis Vaccines & Diagnostics Inc. v. Stop Huntington Animal Cruelty USA, Inc.</u>,
   50 Cal. Rptr. 3d 27 (Cal. App. 1 D. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Oglesby v. U.S. Dep't of Army</u>,
   920 F.2d 57 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Phillipi v. CIA</u>,
   546 F.2d 1009 (D.C. Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Public Citizen Health Research Grp. v. FDA</u>,
   185 F.3d 898 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Rainwater v. United States</u>,
   356 U.S. 591 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

<u>Rosenfeld v. U.S. Dep't of Justice</u>,
   57 F.3d 803 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

<u>Schiller v. NLRB</u>,
   964 F.2d 1205 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Shalala v. Ill. Council on Long Term Care, Inc.</u>,
   529 U.S. 1 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

<u>Showing Animals Respect & Kindness v. U.S. Dep't of Interior</u>,
   730 F. Supp. 2d 180 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34, 41

<u>Sims v. CIA</u>,
   642 F.2d 562 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<u>Stern v. FBI</u>,
   737 F. 2d 84 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42

<u>U. S. Dep't of Justice v. Tax Analysts</u>,
   492 U.S. 136 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

<u>U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press</u>,
   489 U.S. 749 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

<u>United States v. Fullmer</u>,
   584 F.3d 132 (3d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States, ex rel. Haight v. Catholic Healthcare W.,
 Civ. No. 01-2253, 2007 WL 2330790 (D. Ariz. Aug. 14, 2007)................... 38

Valfells v. CIA,
 717 F. Supp. 2d 110 (D.D.C. 2010)......................................... 28

Vaughn v. Rosen,
 484 F.2d 820 (D.C. Cir. 1973), ....................................... 26, 39

Wash. Post Co. v. Keogh,
 365 F.2d 965 (D.C. Cir. 1966)............................................ 34

Wash. Post v. HHS,
 690 F.2d 252 (D.C. Cir. 1982)................................... 30, 39, 41, 42

## STATUTES

5 U.S.C. §§ 552 et seq................................................ *passim*

7 U.S.C. §§ 2131 et seq.......................................... 1, 3, 5, 37

16 U.S.C. § 1540(g)..................................................... 4

18 U.S.C. § 43......................................................... 35

31 U.S.C. §§ 3729 et seq.............................................. 38

42 U.S.C. § 289d.................................................... 6, 38

42 U.S.C. §§ 201 et seq. (Pub. L. No. 99-158 (Nov. 20, 1985)).......................... 5

Ala. Code § 36-12-40................................................. 12

## RULES

Fed. R. Civ. P. 56.................................................... 33

Fed. R. Evid. 801.................................................... 34

Fed. R. Evid. 802.................................................... 34

**REGULATIONS**

9 C.F.R. § 2.30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

9 C.F.R. § 2.31. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15, 18

9 C.F.R. § 2.33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17

9 C.F.R. § 2.35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9 C.F.R. § 2.131(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

9 C.F.R. § 3.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9 C.F.R. § 3.6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9 C.F.R. § 3.8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

9 C.F.R. § 3.131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

45 C.F.R. § 74.25(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**OTHER**

Benjamin Adams and Jean Larson, USDA Nat'l Agricultural Library, Animal Welfare
        Information Center, Legislative History of the Animal Welfare Act,
        http:www.nal.usda.gov/awic/pubs/AWA2007/intro.shtml. . . . . . . . . . . . . . . . . . . . . . . . 5

Reid G. Adler, Controlling the Applications of Biotechnology: A Critical Analysis of the
        Proposed Moratorium on Animal Patenting, 1 Harv. J. Law & Tec. 1 (1988). . . . . . . . . . 5

K. Broaddus, et al., "Renal Allografrt Histopathology in Dog Leukocyte Antgen Mismatched
        Dogs After Renal Transplantation," 35:124 Veterinary Surgery at 136 (2006).. . . . . . . . 32

The Use of Animals in Medical Research and Testing: Hearings Before Subcomm. on
        Science, Research, and Technology of the Comm. on Science and Technology,
        97 Cong. 24 (1981) (statement of Rep. Ted Weiss).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Introduction**

Plaintiff People for the Ethical Treatment of Animals ("PETA") opposes the government

defendant's motion to dismiss in part and for summary judgment.  As demonstrated below, this

case under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 et seq.,  involves what the

Supreme Court has recognized is "the basic purpose" of the FOIA    "'to open agency action to

the light of public scrutiny.'" U.S. Dep't of Justice v. Reporters Comm. For Freedom of the

Press, 489 U.S. 749, 772 (1989).  Over five years ago PETA submitted a complaint to defendant

National Institutes of Health ("NIH") detailing not only numerous violations of the Animal

Welfare Act ("AWA"), 7 U.S.C. §§ 2131 et seq., by particular researchers experimenting on dogs

at Auburn University in Alabama, but also evidence of the misuse of federal grant money.  Yet,

despite the fact that NIH's own policy mandates that it "will" investigate such matters, when

PETA subsequently submitted a FOIA request to ascertain what, if any, action NIH had taken in

response to its complaint, the agency asserted that it could "neither confirm nor deny" even the

existence of any such records without causing an "unwarranted invasion" of the researchers'

personal privacy.

To make matters worse, although Auburn University itself readily acknowledged to

PETA that NIH was in fact conducting an investigation of the matters discussed in PETA's

Animal Welfare Complaint, it nevertheless informed PETA that it also could not provide the

organization with any records under the Alabama Open Records Act concerning the investigation

or its outcome because NIH had made the University sign a "confidentiality agreement"

forbidding it from doing so.  Accordingly, NIH, which provides millions of dollars in taxpayer

money to Auburn University for animal research, and is required by law to ensure that such

money is not used for inhumane or other improper purposes, is actively interfering with the

public's ability to find out what, if any, action it has taken to fulfill these important mandates, by

refusing not only to process plaintiff's federal open records request, but also prohibiting the

recipient of those funds from providing plaintiff with any information about the investigation

under the state's open records statute.  Such obfuscation    particularly under the present

Administration's commitment to "creat[e] an unprecedented level of openness in Government"

for the purpose of "ensur[ing] the public trust and establish[ing] a system of transparency, public

participation, and collaboration," Presidential Memorandum (Jan. 21, 2009), 74 Fed. Reg. 4685

(Jan. 26, 2009), Plaintiff's Exhibit ("Pl. Ex.") A    should not be tolerated by the Court.

Accordingly, for the reasons more fully discussed below, the government's motion for

summary judgment should be denied and NIH should be ordered to process in full plaintiff's

FOIA request, and to produce a copy of its confidentiality agreement with Auburn University.[1]

## BACKGROUND

Before turning to plaintiff's legal arguments, it is important to provide the Court with the

pertinent statutory and regulatory framework, as well as the relevant facts to date.

---

[1] Although there also is no basis for NIH's decision to withhold information from other records that are included in PETA's Complaint in this action, PETA is challenging only the government's assertion of a "Glomar" response and the withholding of the "confidentiality agreement" it required from Auburn University, in refusing to process PETA's July 25, 2007 and August 21, 2008 requests.  See also Letter to Marina Braswell from Katherine Meyer (Feb. 2, 2010), Pl. Ex. B (making clear that PETA does not seek access to any "draft articles and illustrations, which had not been published, when provided to OLAW," nor "the names and personal identifying information regarding any person mentioned in the requested records other than the principal investigators for the research at issue . . . ."

A.     **Laws And Policies Intended To Protect Animals Used In Research**

1.     **The Animal Welfare Act**

The AWA was enacted  "to insure that animals intended for use in research facilities or for exhibition purposes . . . are provided humane care and treatment." 7 U.S.C. § 2131(1) (emphasis added).  The statute is administered by the United States Department of Agriculture ("USDA"), and requires the agency to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors," id. § 2143(a)(1), including minimum requirements for "procedures to ensure that animal pain and distress are minimized, including adequate veterinary care with the appropriate use of anesthetic, analgesic, tranquilizing drugs, or euthanasia."   Id. § 2143(a)(3)(A).

The AWA provides that "upon inspection" a research facility must demonstrate, and report annually to the USDA, that all applicable AWA standards are being met, "and that professionally acceptable standards governing the care, treatment, and use of animals are being followed by the research facility during actual research or experimentation."  Id. § 2143(a)(7)(A). It further provides that each research facility must establish a committee   commonly referred to as the Institutional Animal Care and Use Committee ("IACUC")    that ensures that the facility is in compliance with all applicable standards.  Id. § 2143(b).

The USDA's implementing regulations provide that animals used in research must be handled in a way that "does not cause" them "behavioral stress" or "unnecessary discomfort," 9 C.F.R. § 2.131(b)(1); that each research facility "shall have an attending veterinarian who shall provide adequate veterinary care," id. § 2.33(a); that animals used in research are observed "daily . . . to assess their health and well-being," id. § 2.33(b)(3); that dogs are housed in enclosures that

"protect [them] from injury," id. § 3.1(a), and provide them with "sufficient space

 . . . to turn about freely," id. § 3.6(a)(2)(xi); that dogs must be provided "the opportunity for

exercise," id. § 3.8; and that certain records are maintained by each facility.  Id. § 2.35.  The

regulations further provide that each facility's IACUC "shall . . . [r]eview, and if warranted,

investigate concerns involving the care and use of animals at the research facility resulting from

public complaints received and from reports of noncompliance received from laboratory or

research facility personnel or employees," id. § 2.31(c)(4); "[r]eview and approve . . . proposed

significant changes regarding the care and use of animals in ongoing activities," id. § 2.31(c)(7);

and determine that the facility's "[p]rocedures involving animals will avoid or minimize

discomfort, distress, and pain to the animals," and that investigators have considered

"alternatives to procedures that may cause more than momentary or slight pain or distress to the

animals."  Id. §§ 2.31(d)(1)(i)-(ii).

        Unlike many environmental statutes that contain "citizen suit" provisions authorizing

members of the public to bring enforcement actions against violators of the statute's prohibitions,

see, e.g., the Endangered Species Act, 16 U.S.C. § 1540(g), the AWA can only be enforced by

the USDA.  See 7 U.S.C. § 2149.  However, the USDA is notoriously lax in bringing such

actions.  Thus, for example, a 2005 Audit Report by the USDA's own Inspector General found

that the agency "is not aggressively pursuing enforcement actions against violators of the AWA,"

and that IACUCs "are not effectively monitoring animal care activities or reviewing protocols."

See Audit Report: APHIS Animal Care Program, Inspection and Enforcement Activities

(September 2005), Pl. Ex. C, at i-ii.

### 2.   Health and Human Service's Requirements Governing Animal Research

In 1985, in response to a widely publicized animal cruelty case based on an undercover investigation by PETA, Congress, as part of the Health Research Extension Act, Pub. L. No. 99-158 (Nov. 20, 1985), gave the Department of Health and Human Services ("HHS")   NIH's parent agency    authority to establish guidelines for the proper treatment of animals used in research in NIH-funded laboratories.  See Pub. Health Service Act, 42 U.S.C. §§ 201 et seq.; see also Reid G. Adler, Controlling the Applications of Biotechnology: A Critical Analysis of the Proposed Moratorium on Animal Patenting, 1 Harv. J. Law & Tec. 1, 36-37 and n.233 (1988) (explaining that this provision was enacted in response to a criminal case brought against a federally-funded researcher for his cruel treatment of monkeys in research conducted at NIH's Institute of Behavioral Research in Silver Spring, Maryland); Int'l Primate Prot. League v. Inst. for Behavioral Research, 799 F.2d 934, 935-936 (4th Cir. 1986) (recounting history of the case and that it was brought to light by one of the founders of PETA); see also, e.g., The Use of Animals in Medical Research and Testing: Hearings Before the Subcomm. on Science, Research and Technology of the Comm. on Science and Technology, 97 Cong. 24 (1981) (statement of Rep. Ted Weiss) (observing that PETA's exposé of the Silver Spring research facility "shocked and horrified Americans as the hellish tale unraveled in the nation's newspapers," and that the animal abuse at that particular facility was "only the tip of the iceberg of the mistreatment of animals in scientific endeavors").[2]

---

[2] The USDA itself credits PETA's exposé of the cruel treatment of the "silver spring monkeys" for 1985 amendments to the AWA that also strengthened protections for laboratory animals.  See Benjamin Adams and Jean Larson, USDA Nat'l Agricultural Library, Animal Welfare Information Center, Legislative History of the Animal Welfare Act,

The Public Service Health Act provides that the Secretary of HHS "shall establish guidelines for . . . [t]he proper care of animals to be used in biomedical and behavioral research," 42 U.S.C. § 289d(a), and that such guidelines "shall require . . . the appropriate use of tranquilizers, analgesics, anesthetics . . . and euthanasia," as well as "appropriate pre-surgical and post-surgical veterinary medical and nursing care." <u>Id.</u>  The statute also provides that the guidelines "shall require [IACUCs] at each entity which conducts biomedical and behavioral research with [federal funds] . . . to assure compliance with the guidelines." <u>Id.</u> § 289d(b).  It further requires that if the Director of NIH determines that "the conditions of animal care, treatment, or use in an entity which is receiving a grant, contract, or cooperative agreement involving research on animals [under the Act] do not meet [the] applicable guidelines . . . ," and no action has been taken to correct such conditions, the Director of NIH "<u>shall suspend or revoke such grant or contract</u> under such conditions as the Director determines appropriate." <u>Id.</u> § 289d(d) (emphasis added).

Pursuant to the Health Research Extension Act, the Public Health Service ("PHS")   an entity within HHS that oversees NIH   has issued a "Policy on Humane Care and Use of Laboratory Animals" ("Animal Care Policy" or "Policy") that is administered by the Office of Laboratory Animal Welfare ("OLAW").  <u>See</u> Pl. Ex. D.  The Animal Care Policy "is applicable to all PHS-conducted or supported activities involving animals," including research by institutions awarded federal funding for such research.  <u>Id.</u> at 7.  The Policy provides that "[n]o activity involving animals may be conducted or supported by the PHS until the institution conducting the activity has provided a written Assurance . . . setting forth compliance with the

---

http://www.nal.usda.gov/awic/pubs/AWA2007/intro.shtml.

Policy," and demonstrating the adequacy of the institution's "program for the care and use of animals." <u>Id.</u> at 9.  It further states that "[w]ithout an applicable PHS-approved Assurance, no PHS-conducted or supported activity involving animals at the institution will be permitted to continue." <u>Id.</u>  The Policy emphasizes that, in addition to whatever supplemental standards an institution may adopt for its animal care program, research institutions must always comply with all applicable AWA regulations.  <u>See</u> Policy at 9 n.2 ("<u>Compliance with the USDA regulations is an absolute requirement of this Policy</u>") (emphasis added).

OLAW is responsible for the general administration and coordination of the Animal Care Policy, <u>id.</u> at 18, which further mandates that OLAW "<u>will</u> . . . <u>evaluate allegations of noncompliance with this Policy</u>."  <u>Id.</u> at 10 (emphasis added).

However, like the USDA, OLAW has a reputation for not taking seriously its duty to enforce animal welfare standards.  Thus, for example, based on documents obtained from OLAW under the FOIA, the Humane Society of the United States reported in 2006 that "OLAW <u>rarely, if ever, follows up first-hand to make sure that corrective plans are implemented and followed</u>" by institutions that report departures from mandated standards, and that it has failed to exercise much needed federal oversight when "serious problems" arise concerning animal care at institutions receiving NIH funding.  <u>See</u> L. Gomez, <u>et al.</u>, Noncompliance with Public Health Service (PHS) Policy on Humane Care and Use of Laboratory Animals: An Exploratory Analysis (2006), Pl. Ex. E, at 6, 9 (emphasis added); <u>see also id.</u> at 10 ("OLAW's hands-off response to reports of serious or continuing noncompliance is <u>emblematic of the low level of OLAW engagement of its mission</u> that has received media scrutiny and raised questions about the nature of the relationship between OLAW and the institutions it oversees.") (emphasis added).

-7-

NIH policies also require institutions receiving federal funds to "ensure that costs charged to awards are <u>allowable, allocable, reasonable, [and] necessary</u>," <u>see</u> NIH Grants Policy Statement (Oct. 2, 2010), Pl. Ex. F, at 8.1.1 (emphasis added), and grant recipients "are required to report deviations from budget and program plans, and request prior approvals for budget and program plan revisions." 45 C.F.R. § 74.25(c)(1).

### B.       Animal Welfare Problems At Auburn University

Auburn University, a state operated university located in Auburn, Alabama, has for years received millions of dollars in federal funding from NIH to conduct various research on dogs and other animals.   According to NIH's website, since 2005, Auburn has received approximately $15.5 million dollars in such grant money.  <u>See</u> Declaration of Justin Goodman ¶ 10.  However, Auburn, and in particular, one of its now former faculty members, Dr. Clinton Lothrop, have been the subject of repeated complaints concerning the quality of care provided to animals used in research there.

### 1.       Concerns That Dr. Lothrop Left Sick Animals Unattended

In August 2003, Dr. Henry Baker, Director of the Scott-Richey Research Center at Auburn, expressed concerns about "the adequacy of veterinary supervision for dogs" under Dr. Lothrop's care, "noting that there were times when no one responsible for the care of these dogs [was] in the Center," and stressing that his "major concern was the large number of dogs with very serious diseases" that were not being properly attended.  <u>See</u> Minutes of Meeting With Drs. Baker and Lothrop (Aug. 8, 2003), Pl. Ex. G.

In October 2003, two of Dr. Lothrop's colleagues complained to the Dean of the Veterinary School that Dr. Lothrop had failed to provide adequate veterinary care to a dog with

"a severe, painful bleeding episode," by failing to return to the facility to treat or euthanize the

dog after being notified of the problem by the veterinary technician on duty, and that, as a result,

"[t]he dog suffered substantially for more than 8 hours because Lothrop was not attending to his

responsibilities for animal care and did not make appropriate arrangements for another

veterinarian to assume those responsibilities."  See Email from Henry Baker (Oct. 13, 2003), Pl.

Ex. H (emphasis added); see also Memorandum from Dr. Holland to Dean Boosinger (Oct. 27,

2003), Pl. Ex. I (describing the incident in detail and the fact that the technician on duty "had

been calling Dr. Lothrop all day about the dog, who had an acute bleed into his spinal cord, and

was in extreme pain, but was unable to contact [Dr. Lothrop]").  In response to this incident, Dr.

Baker informed his colleagues that "[t]he time has come to confront Lothrop and withdraw

ACUC [Animal Care and Use Committee] approval for the projects for which he is responsible

until and unless the responsibility for veterinary care is assumed by someone else."  Pl. Ex. H.

       A subsequent investigation by Auburn's IACUC concluded that "Dr. Lothrop's non-

traditional hours and his frequent time away from the [Scott-Richey Research Center] . . .

coupled with the absence of a well-defined schedule of veterinary back-up have had a negative

impact on the provision of adequate veterinary care" for the animals being used in his research.

See Conclusions and Recommendations of the IACUC Subcommittee Regarding the Issue of

Veterinary Care for IACUC Protocols under the Direction of Dr. Clint Lothrop (Jan. 2004) (and

attached email transmitting the report), Pl. Ex. K (emphasis added).  The IACUC also found that

Dr. Lothrop had conducted research procedures that had not been approved, was using

unapproved drugs, was sending dogs to other facilities without approval, and was housing dogs

used in kidney transplant experiments at his home    a practice that was also not permitted.  See

id.

On March 9, 2004, Dr. Timothy Boosinger, Auburn's Dean of Veterinary Medicine, sent Dr. Lothrop a memorandum stating that he was "increasingly concerned" that Dr. Lothrop was "continuing to 'moonlight'" at another job in Atlanta, Georgia, which caused him to be absent from the Research Center.  See Memorandum from Timothy Boosinger to Dr. Clint Lothrop (March 9, 2004), Pl. Ex. L.  Dr. Boosinger further informed Dr. Lothrop that his "continuing disregard for University leave policies and for knowingly being absent without leave from [his] place of employment is a fraudulent act," and that the IACUC investigation "found a disturbing correlation between [his] non-traditional work hours and frequent trips to Atlanta and the provision of adequate veterinary care."  Id. (emphasis added).  A subsequent memorandum from the Director of the Research Center to the Dean of the Veterinary College suggested that, due to his unapproved absences, Dr. Lothrop may have "defrauded" the University for over $50,000, and that Dr. Lothrop not only "refuses to accept the authority of the Center Director or Dean," but also "fails to comply with normal University policies and procedures, including nationally mandated standards of animal care . . . ."  See Memorandum (April 6, 2004) and attached "Historical Summary of Dr. Lothrop's Unsatisfactory Performance," Pl. Ex. M (emphasis added).

### 2.    Concerns About Auburn University's Kidney Transplant Experiments

Despite all of these concerns about the quality of care provided by Dr. Lothrop, on June 21, 2004, Auburn issued a press release announcing that Dr. Lothrop and his colleague, Dr. Michael Tillson, were leading a team of researchers who had "developed a revolutionary new canine kidney transplant procedure that promotes increased tolerance of transplanted organs

between unrelated dogs"   i.e., a dog with kidney failure could receive a kidney transplant from another dog without having to receive powerful (and expensive) immunosuppressive drugs for the rest of its life.  See Auburn Press Release (June 21, 2004), Pl. Ex. N; see also id. at 2 ("Lothrop says kidney failure had previously been considered a death sentence for dogs because of organ rejection . . . '[i]ncreasing tolerance is the key, because without it, something as simple as a kennel cough could cause significant illness or even lead to the death of a dog on immunosuppressive drugs . . . [a]nd it should be less expensive for dog owners in the long-run, making a kidney transplant a more affordable option for them'") (emphasis added).  Indeed, Auburn's Press Release boasts that "[d]og owners from New Orleans to Atlanta [] have had their dogs undergo the new transplant protocol at Auburn with the hope of extending their dog's lives," and that "Auburn is the only program using this specific protocol that offers the chance of reducing or eliminating the requirement for long-term immunosuppressive drug therapy."  Id. (emphasis added).

However, less than a month later, on July 18, 2004, Dr. Merrillee Holland, a veterinarian at the Research Center who worked on the dog kidney transplant experiments, sent the Center's Director, Dr. Baker, a detailed memorandum expressing grave concerns about inadequate and unapproved protocols that were being used by Drs. Lothrop and Tillson in the kidney transplants.  See Memorandum from Dr. Holland (July 18, 2004), Pl. Ex. O.  Thus, Dr. Holland stressed that the protocol being used "does not include 'rescue' therapy for dogs showing signs of renal transplantation rejection"   and that, therefore, dogs experiencing rejection of the transplanted organs were becoming extremely sick and having to be euthanized.  Id. (emphasis added).  Dr. Holland also noted that the protocol requirement that the dogs used in the procedure be

"unrelated" was also "not being followed," that there had been "manipulation of the data by

masking renal transplantation rejection," and that a particular dog "has been treated like a test

tube experiment" due to the lack of approved protocol procedures.  Id. at 1-2.

By letter dated August 2, 2004, Dr. Baker informed both the Chairman of the University's

IACUC and Dr. Boosinger that "[s]everal dogs on the Lothrop/Tillson kidney transplantation

protocol . . . have had serial, recurring illnesses" related to the "rejection of their transplanted

kidneys," that "[d]ogs on this study are becoming seriously ill," that "the investigators are

performing repeated rescue procedures that are not described in approved ACUC protocol," and

that the IACUC also "has not been given the required information to make an informed decision

on the justification for serial, recurring uremia/rejection episodes and intensive care rescue, with

respect to the objectives of this study."  See Letter to Byron Blagburn (Aug. 2, 2004), Pl. Ex. P

(emphasis added).

A document obtained from Auburn University under the Alabama Open Records Act,

Ala. Code § 36-12-40, shows that on November 17, 2004, PHS officials notified Auburn

University of the "Findings" of "an External Review Committee Regarding Animal Welfare

Issues Related to Research Projects Directed by Dr. Clint Lothrop at Auburn University," see

Letter to Michael Moriarty (Nov. 17, 2004), Pl. Ex. Q, and that, based on its own investigation,

the review committee reported that "the concerns about adequacy of veterinary care for dogs in

Dr. Lothrop's research projects . . . were justified," that "veterinary care and supervision

provided for dogs in the renal transplantation project was sometimes inadequate," that Dr.

Lothrop's absences from work "caused disruptions in the delivery of timely veterinary care for

his research dogs," and that "Dr. Lothrop failed to revise the project's approved IACUC protocol

in a timely manner to properly reflect [] changes in study design and treatment protocols . . . ."
Id. at 1-2 (emphasis added).[3]

Nevertheless, records obtained under FOIA from the USDA show that almost a year later,
on June 7, 2005, when the University had failed to take any meaningful remedial action, Dr.
Holland submitted a 67-page complaint to the USDA concerning the dog kidney transplant
experiments being conducted by Drs. Lothrop and Tillson.  See Submission from Dr. Holland
(June 7, 2005), Pl. Ex. R.  Dr. Holland presented detailed evidence that the researchers are
"negligent when it comes to post-surgical follow-up care," resulting in what she characterized as
"some of the worst suffering I have seen in my career."  Id. (emphasis added).  She also
explained that, although she had tried to have her concerns addressed internally at the University,
"little has changed for the animals used in the experiments," and, thus, she urged the USDA to
"review this matter on its own and cite the university for violations of the Animal Welfare Act."
Id. (emphasis added); see also, e.g., id. at 2 (identifying "Drs. Clint Lothrop and Michael Tillson"
as the individuals about whom she complained); see also id. at 1 ("it is my fervent hope that [the
USDA] will not consider this matter resolved just because internal investigations and a review
committee have had a look at it," because "[d]ogs continue to suffer." (emphasis added)).

Dr. Holland also complained that Auburn University's press release concerning these
experiments contained potentially "fraudulent information to the public about kidney transplants
for pets" by both stating that the transplants being conducted were between "unrelated" dogs and
suggesting that the transplant recipients would not be required to take high-doses of

---

[3] This document was released by Auburn apparently before it was required to enter into a
confidentiality agreement with NIH with respect to the records at issue in this case.

immunosuppressive drugs for the rest of their lives, when, in fact, the only dog that had survived

a transplant had received a kidney from a <u>sibling</u>, and "[a]t the time of this press release, the

unrelated dogs in Lothrop and Tillson's project had not been successfully removed from

immuosuppressive drugs." <u>Id.</u> at 2.  Thus, as Dr. Holland explained, the press release's

suggestion that Drs. Lothrop and Tillson were successfully transplanting kidneys from unrelated

dogs, "resulted in clients hoping that their dogs could be saved by a kidney transplant," at a cost

of "up to $10,000+," when, as a result of deficient protocols for dealing with organ rejection, the

dogs in these experiments were experiencing excruciating pain, suffering, and death.  <u>Id.</u> at 2.

Dr. Holland further reported that Dr. Lothrop's excessive absences from the veterinary clinic had

negative impacts on the provision of adequate care for the animals, that an internal report

revealed that he had sent dogs from Auburn to Seattle without IACUC approval, that Dr. Lothrop

"was holding puppies and adult dogs at his home and bringing them in for various projects," and

that "donor dogs from client surgeries have been observed recovering post-operatively <u>in a</u>

<u>storage area</u>" at the facility.  <u>Id.</u> at 3-4 (emphasis added).[4]  Records released under the state's

open records law indicate that Dr. Holland's complaint was also submitted to OLAW at NIH.

<u>See</u> Letter to Michael Moriarity, Vice President for Research, Auburn University, from Alex

Wolff, Director, NIH Director of Division of Compliance Oversight (June 28, 2005), Pl. Ex. S.[5]

---

[4] Dr. Holland also reported that Dr. Tillson had fraudulently represented the data on these experiments to the Auburn University College of Veterinary Medicine Annual Conference.  <u>Id.</u> at 3.

[5] Thus, NIH official Dr. Wolff stated that OLAW "has received an allegation of continuing problems associated with the care and treatment of research dogs used in kidney transplant studies at Auburn University," including the fact that "Investigators Clint Lothrop and Michael Tillson were allegedly performing experimental kidney transplant procedures on client animals in the absence of a protocol reviewed and approved by the IACUC," and that "[k]idney

In response to Dr. Holland's complaint, the USDA conducted an inspection of Auburn's Research Center, and, on August 4, 2005, issued an "Inspection Report" citing Auburn University with several violations of the AWA with respect to the renal transplantation procedures, including, inter alia, failure to obtain approval of certain procedures from the IACUC, failure to consider alternatives to procedures that cause pain and distress to the animal, failure to include a complete description of anesthesia practices, and failure to properly label and maintain various medications. See Inspection Report (Aug. 4, 2005), Pl. Ex. T (citing AWA regulations, 9 C.F.R. §§ 2.31, 2.30, 3.131).

However, on August 24, 2005, OLAW   which was apparently operating on a different track than the USDA   sent a letter to Auburn stating that, "[b]ased on its assessment of the information provided by Auburn University, OLAW is satisfied that animal care and use procedures at Auburn are in compliance with the PHS Policy and finds no cause for further action." See Letter from Dr. Axel Wolff (Aug. 24, 2005), Pl. Ex. U (emphasis added).

### 3.    PETA's Undercover Investigation Of Auburn University

Concerned about rampant violations of the AWA at Auburn's research facility, and eager to collect and provide to the appropriate authorities direct evidence of such violations so that appropriate enforcement action could be taken, PETA was able to place an undercover investigator in Dr. Lothrop's laboratory, who worked there between February 14, 2005 and October 28, 2005. See Goodman Decl. ¶ 13.

---

donor animals reportedly are allowed to recover in suboptimal facilities such as storage areas," that "Investigator Lothrop allegedly prescribed sub-therapeutic doses of antibiotics to the dogs which led to inadequate clinical outcomes and possible animal distress." Id. Each of these allegations was included in the 67-page complaint that Dr. Holland sent to the USDA on June 7, 2005. Compare with Pl. Ex. R.

On September 27, 2005, this individual sent a letter to the Director of NIH to report the "misappropriation of NIH funds" by Dr. Lothrop and another colleague, Glenn Niemeyer, who were using money awarded by NIH for research for a project entitled "Elastase and B3A Function in Cyclic Hematopoiesis Dogs" (commonly referred to as "the grey dog grant") to perform renal transplants for private clients.  See Letter to Dr. Zerhouni, Director of NIH  (Sept. 27, 2005), Pl. Ex. V; see also Goodman Decl. ¶ 8.  According to NIH's website, Auburn received a total of $1.6 million in federal money for the grey dog project.  Id.  However, as reported by PETA's investigator, "everything in the Lothrop lab is billed to the grey dog grant account, including all lab supplies, diagnostic and genetic tests for client transplant dogs as well as dogs used in all other research projects . . . ."  Id. (emphasis added).  The investigator further reported that although the Director of the lab "has confronted Drs. Lothrop and Niemeyer about their misappropriation of funds . . . the problem has not stopped," and he therefore urged NIH to "investigate this matter immediately," especially because the grey dog grant was coming up for renewal in the near future.  Id.

Almost a year later, on August 30, 2006, PETA sent both the USDA and NIH a 53-page "formal complaint" detailing numerous eye-witness accounts of violations of the AWA by Drs. Lothrop, Tillson, and Niemeyer, including three DVDs with undercover video footage depicting the offensive practices.  See PETA Animal Welfare Complaint (Aug. 30, 2006), Pl. Ex. W; see also 2006 DVDs submitted by PETA, Pl. Ex. W1-W3.  PETA's Complaint included detailed accounts of the mistreatment of more than a dozen specifically identified dogs, correlating each allegation of mistreatment with the specific AWA standard that was being violated.  PETA Animal Welfare Complaint, Pl. Ex. W.

For example, with respect to the failure to provide prompt and appropriate veterinary care and euthanasia, see 9 C.F.R. § 2.33, PETA reported that during the 8-month long investigation "multiple people in positions of authority," including members of Auburn's IACUC, "the attending veterinarian" and the director of the Center "were made aware that dogs were being neglected and denied veterinary care, but they failed to act." See PETA Animal Welfare Complaint, Pl. Ex. W at 1; see also DVD 1 at 0:16-2:00 (undercover footage depicting dogs with an eye condition called "cherry eyes" that did not receive proper treatment); id. at 2:01-4:00 (recording conversation in which a technician suggests that calling Dr. Lothrop when the dogs are not healing properly after surgery would be counterproductive); id. at 5:00-9:48 (depicting a necropsy of a dog who died in a cage and recording conversation which suggests that no one in the laboratory had adequately monitored her condition); id. at 10:56-12:09 (recording conversation in which a technician suggests that a dog who is "still sick" has "done more than his share"); id. at 12:36-14:25 (recording conversation in which an employee demonstrates lack of knowledge about the protocol for euthanizing suffering animals); id. (stating that Dr. Lothrop is more concerned with getting results that alleviating suffering); id. at 17:30-18:15 (discussing a dog with arrhythmia and revealing that the attending veterinarian does not know whether the condition is being treated); id. at 18:36-21:49 (depicting a dog who had suffered from a severe uterine infection for months before finally being spayed); id. at 23:10-24:06 (hemophilic dog denied care for swollen, blood-filled mass); id. at 24:49-26:03 (depicting dog with an injured leg who was not treated or given pain medication for more than a day); id. at 27:16-27:47 (depicting a dog who underwent full-body irradiation and was housed in a tiny cage, where she could not

-17-

avoid her own vomit and excrement).[6]

Thus, the Complaint detailed dogs denied treatment for various serious conditions, including severe infections, DVD 1 at 18:36-21:49, blood-filled masses, id. at 23:10-24:06, and severe injuries, id. at 24:49-26:03, as well as a dog in an advanced state of kidney failure who was left to die for over a week before being finally euthanized, DVD 3 at 14:24-1:02:00, and a dog who was found dead in her cage months after being diagnosed with an arrhythmia for which she was never treated.  See DVD 1 at 5:00-9:48, 17:30-18:15; PETA Complaint at 2.

As to the failure to avoid or minimize pain and discomfort during procedures, see 9 C.F.R. § 2.31(d), PETA's Complaint reported, and the attached videotape further demonstrates, a host of procedures conducted by Dr. Lothrop that were not only inadequate, but palpably cruel, including, for example bone marrow extractions performed on dogs who were not sufficiently anesthetized, "causing a research technician to recount witnessing dogs 'screaming' in pain when large needles bored through their bodies," and incompetent blood extractions and use of the dialysis machine, "resulting in treatments that ended abruptly with too much blood left in the machine and too little blood in the dogs." PETA Complaint; DVD 1 at 32:17-37:10 (discussing that dogs were not sufficiently anesthetized during bone marrow extractions); id. at 31:18-32:16 (recording a conversation about Dr. Lothrop's poor ability to draw blood); DVD 2 at 32:26-42:00 (depicting repeated failures to get a needle into the neck of a dog named Wilbur); DVD 3 at 5:06-9:52 (depicting repeated failures to draw blood from a dog named Holly); DVD 2 at 50:27-

---

[6] See also DVD 2 at 26:54-29:40, 32:26-43:20 (depicting Wilbur, a dog whose reaction to the experiments left him panting, shaking, and struggling to get comfortable); DVD 3 at 14:24-1:02:00 (depicting a dog who was in advanced kidney failure over a long period of time, and who had lost muscle mass because she would not eat and who eventually died during a dialysis treatment).

1:06:30 (technicians experience difficulties in properly using dialysis machine, resulting in loss of blood from a dog; Dr. Lothrop is unable to fix the problem).[7]

As to the failure to provide exercise and socialization, as required by AWA regulations, see 9 C.F.R. § 3.8, PETA reported that among the undercover investigator's "most disturbing discoveries" was "the advanced state of psychological deterioration from which most of the dogs suffered," and that many of the dogs in Dr. Lothrop's lab engaged in what are called "stereotypic" i.e. abnormal   behaviors, "including circling, spinning, side-stepping, and neurotic jumping." PETA Complaint at 3; see also, e.g., DVD 1 at 18:16-18:35 (depicting a collie circling in her kennel); id. at 37:11-39:00 (people in the lab laughing at a dog exhibiting stereotypic behavior); DVD 2 at 1:00-12:45 (depicting dogs in barren cages and runs repeatedly running in circles or making figure-eight motions); id. at 16:41-16:55 (two dogs running in circles over and over).

PETA's Complaint further reported that, with rare exception, "the animals were **never** taken out of their enclosures for walks or [] play time with other dogs or human caretakers," and that "[t]he dogs were so starved for attention that when people entered their kennels, they barked maniacally until many of them went hoarse and lost their voices."  PETA Complaint at 3 (emphasis in original); see also DVD 2 at 1:00-6:13; DVD 1 at 18:16-18:35.  In support of this

---

[7] See also DVD 3 at 21:31-25:47 (tubing from dialysis machine to dog is repeatedly falling out); id. at 25:48-26:32 (veterinary student stating that she's not sure that repeated dialysis on a dog has "always been in [the dog's] best interest" but that it has been useful training); id. at 29:43-31:29 (discussing that the veterinary students and technicians did not know how to use the dialysis machine and that Dr. Lothrop wasn't able to provide them with the necessary information); id. at 35:46-38:53 (describing that the technicians did not receive formal training to use the dialysis machine); id. at 42:10-46:03, 50:00-58:04 (additional problems with the dialysis machine).

part of its Complaint, PETA submitted a statement from renowned animal behaviorist Dr. Marc

Bekoff, former Professor of Ecology and Evolutionary Biology at the University of Colorado,

who has studied dog behavior for over 35 years.  See Statement of Dr. Marc Bekoff (Feb. 10,

2006), Pl. Ex. X, who stated that the dogs in the Auburn lab demonstrate "some of the **worst**

stereotypic behavior" he has ever seen.  Id. (emphasis in original).  Dr. Bekoff further stated that:

> The dogs were so far gone that they reminded me of cases where neglected
> and abused dogs approach the people who have harmed them out of sheer
> desperation for attention.  The distress of the dogs . . . was palpable . . .
> The dogs exhibit signs of chronic stress which is manifested by stereotypical
> behavior.  These behaviors indicate an extreme psychological disturbance
> among these animals, which undoubtedly causes tremendous and inexcusable
> suffering.  The failure to provide adequate enrichment and socialization for
> these highly social animals is a form of cruel mistreatment and neglect.

Id. (emphasis added).  Dr. Bekoff concluded that, based on his expertise, "[t]he dogs in the video

are **very disturbed** and **extremely** mistreated."  Id. (emphasis in original).

PETA also reported that Drs. Lothrop's and Tillson's representations to the public that

they could successfully transplant kidneys in dogs were fraudulent, and that "[i]n recent years,

more than a dozen of these desperate people have paid Auburn approximately $15,000 each to

conduct kidney transplants on their dying dogs," when, "without fail, all these dogs have died

horrible deaths within a very short time of undergoing the transplants . . . ."  Id. at 4.

PETA also informed the agencies that "all" of the work in Dr. Lothrop's lab "is paid for

using funds from a grant titled, 'Elastase and B3A Function in Cyclic Hematopoiesis Dogs,'

funded by the National Institutes of Health (NIH)," and that "[m]oney from this grant is

misappropriated and spent on all lab supplies; diagnostic and genetics tests for client transplant

dogs as well as for dogs use in all other research projects . . . [and] salaries for lab workers not

involved in the NIH-funded project."  PETA Complaint at 4 (emphasis added).

Based on all of this evidence, PETA urged the agency to "immediately conduct a thorough investigation of the labs at Auburn University," and to make sure that researchers who are found to be in violation of AWA regulations were "prohibited from using animals," that Dr. Lothrop's NIH funds "be revoked immediately," and he never be allowed "to receive the public's tax dollars or to conduct research on animals," and that "[d]ogs who are found to be suffering from illness . . . be immediately relieved of their suffering."  Id. at 5.

Although an internal USDA memorandum dated January 10, 2007, states that PETA's Complaint "was determined to be partially valid," see Animal Welfare Complaint (Jan. 10, 2007), Pl. Ex. Y (emphasis added), to date, more than five-and-a-half years since PETA sent its detailed evidence to both the USDA and NIH, PETA has yet to be informed of any enforcement action that has been taken by either agency in response to its complaint.  See Goodman Decl. ¶ 15.

On the other hand, in response to the same evidence, the Morris Animal Foundation    a nonprofit organization dedicated to research benefitting animals    which had provided funding for Auburn's renal transplantation studies, conducted its own audit and concluded that, based on "lapses in animal care and not complying with research protocols," it would "not fund any future grants in which either Dr. Clinton Lothrop or Dr. Michael Tillson are listed as principal investigators or co-investigators," that it would "not fund studies involving live animals at Auburn University until [it has] received verification that the university has implemented strategies to ensure that animals used in research are not harmed and receive outstanding care, exercise and socialization," and that it would "increase scrutiny of Institutional Animal Care and

Use Committee (IACUC) processes and procedures for all universities submitting grants." <u>See</u>

Memorandum from Morris Animal Foundation (June 5, 2008), Pl. Ex. Z (emphasis added).

In 2007, Dr. Lothrop left Auburn University and was hired by the University of Alabama-

Birmingham.  <u>See</u> Goodman Decl. ¶ 11.  However, according to NIH's website, since July 2007,

he has received more than $1.3 million in additional grant money from NIH to conduct

experiments on dogs.  <u>Id.</u>  Dr. Niemeyer has recently joined Dr. Lothrop at the University of

Alabama-Birmingham.  <u>Id.</u> ¶ 12.  Dr. Tillson remains at Auburn University, which also continues

to receive NIH funding for animal research.  <u>Id.</u>  In fact, according to NIH's website, since 2006

when PETA submitted its formal complaint to NIH, Auburn has been awarded approximately $

12,365,035 in federal research grants.  <u>Id.</u> ¶ 8.  Thus, it appears that no meaningful enforcement

action was taken by NIH in response to the Complaint submitted by PETA, but also the one

submitted by Auburn University's own veterinarian, Dr. Holland.  <u>See</u> <u>supra</u> at 11-12.

> **C.    NIH's Efforts To Ensure That The Public Is Unable To Scrutinize
>         What, If Any, Measures NIH Has Taken To Investigate And Remedy
>         The Alleged Violations Of Law That PETA And Others Have Brought
>         To Its Attention**

On July 25, 2007, having heard nothing from NIH with respect to the formal Complaint it

had submitted on August 30, 2006, PETA submitted a FOIA request to NIH for records "related

to all [NIH] investigations into complaints filed in 2005-present regarding NIH grant recipients

Clint Lothrop . . . , Glenn P. Niemeyer . . . , and colleague Michael Tillson."  Pl. Ex. AA.  On

September 7, 2007, PETA sent a similar request to Auburn University under the Alabama Open

Records Act, Pl. Ex. BB, which sent PETA some documents, but not all of the records it had

requested.  However, on December 12, 2007, Auburn sent PETA a follow-up email stating that it

could not provide PETA with any additional records because of a "signed confidentiality agreement with NIH."  See Email from Ralph Zee to Justin Goodman, Pl. Ex. CC  (emphasis added).  Thus, Auburn informed PETA that the confidentiality agreement imposed an "institutional obligation" on the University never to provide PETA with the records that pertain to the NIH Investigation of PETA's complaint.  Id. (explaining that it is Auburn's understanding "that the institutional obligations" to honor the confidentiality agreement "are in perpetuity" (emphasis added)).

On February 20, 2008, NIH sent PETA a "final response" to PETA's July 25, 2007 FOIA request in which the agency stated that it "neither confirms nor denies the existence of any responsive records," because to do so would cause a "clearly unwarranted invasion of personal privacy," within the meaning of Exemption 6 of FOIA.  Pl. Ex. DD.  In the same letter, NIH emphasized that, based on its refusal to confirm or deny the existence of responsive records, it had "not completed a search for responsive to" PETA's request.  See id.

On March 4, 2008, PETA sent Auburn University another request under the Alabama State Open Records Law for records relating to the dog experiments being done by Drs. Lothrop, Niemeyer, and Tillson, and also requested a copy of the "signed confidentiality agreement between AU and the NIH," and on May 23, 2008, Auburn University confirmed its refusal to provide PETA with those records.  Pl. Exs. EE, FF.  In that letter, although Auburn's General Counsel confirmed that "PETA's interest in the matters that are the subject of [its] request resulted in an investigation by NIH . . . ," he nevertheless reiterated that the University was "not at liberty to disclose any further information" concerning the matter, because NIH had "requested [that] the University enter into the [confidentiality] agreement."  Pl. Ex. FF (emphasis added).

On August 21, 2008, PETA sent NIH a new request for materials related to all NIH investigations into complaints regarding the same researchers, as well as "copies of any signed confidentiality agreement between Auburn University and NIH relating to materials and information with regard to an investigation into the research of Clinton Lothrop and colleagues," Pl. Ex. GG, and, by letter dated August 26, 2008, NIH refused to confirm or deny the existence of any such records.  See Pl. Ex. HH.  On July 12, 2010, NIH sent PETA a letter that it represented as a "substantive response to the appeal" of both PETA's July 25, 2007 request for the investigatory records concerning Drs. Lothrop, Tillson, and Niemeyer, as well as PETA's August 26, 2008 request for access to the "confidentiality agreement" NIH had entered into with Auburn, and again stated that it could neither confirm nor deny the existence of any such records. Pl. Ex. II at 2 ("this letter offers a substantive response to the appeal of both matters").

## ARGUMENT

### Introduction

The Freedom of Information Act was enacted "to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." S. Rep. No. 813, at 3 (1st Sess. 1965).  See also U. S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989); Dep't of the Air Force v. Rose, 425 U.S. 352, 361 (1976).  As the Supreme Court has reaffirmed, "Congress believed that this philosophy, put into practice, would help 'ensure an informed citizenry, vital to the functioning of a democratic society.'"  Tax Analysts, 492 U.S. at 142 (quoting NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978)). Accordingly, "the basic purpose" of the FOIA is "to open agency action to the light of public scrutiny."  U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749,

772 (1989) (quoting Dep't of Air Force, 425 U.S. at 372).

The Act requires each federal agency to make non-exempt records "promptly available to any person" upon request, 5 U.S.C. § 552(a)(3)(A), and vests jurisdiction in the district courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." Id. § 552(a)(4)(B). The agency wishing to withhold a requested record has the burden of proving that the record is exempt from disclosure, and the Court must decide the matter de novo. Id.; Reporters Comm., 492 U.S. at 755. Moreover, as the Supreme Court recently reiterated, consistent with "'the Act's goal of broad disclosure,'" the Court has "insisted that the exemptions be 'given a narrow compass.'" Milner v. Dep't of Navy, 131 S. Ct. 1259, 1261 (Mar. 7, 2011) (emphasis added) (quoting Tax Analysts, 492 U.S. at 151 (1989)); see also Milner, 131 S. Ct. at 1262 (noting that the exemptions to the disclosure mandate are "'explicitly made exclusive,'" and "must be 'narrowly construed.'" (quoting EPA v. Mink, 410 U.S. 73, 79 (1973)); FBI v. Abramson, 456 U.S. 615, 630 (1982).

The Act also specifically requires an agency to disclose all segregable non-exempt information. 5 U.S.C. § 552(b). Thus, as the Court of Appeals for this Circuit has explained, because "[t]he focus in the FOIA is information, not documents'," an agency "'cannot justify its withholding an entire document simply by showing that it contains some exempt material.'" Public Citizen Health Research Grp. v. FDA, 185 F.3d 898, 906 (D.C. Cir. 1999) (quoting Schiller v. NLRB, 964 F.2d 1205, 1209-10 (D.C. Cir. 1992)). This "segregability" requirement "applies to all . . . documents and all exemptions in the FOIA." Schiller, 964 F.2d at 1209 (quoting Ctr. for Auto Safety v. EPA, 731 F.2d 16, 21 (D.C. Cir. 1984)); see also Army Times Publ'g Co. v. Dep't of Air Force, 998 F.2d 1067, 1071 (D.C. Cir. 1993) ("Where non-exempt

information exists within a document, 'a district court clearly errs [by approving] a government[]
[agency's] withholding of information under FOIA without making an express finding of
segregability'" (internal citations omitted)).

Moreover, as the Court of Appeals long ago recognized in the landmark FOIA case,
Vaughn v. Rosen, 484 F.2d 820, 824 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974),
because the agency alone knows what responsive records exist and their contents, "[t]his lack of
knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of
our legal system's form of dispute resolution." Id. Therefore, to "assure that a party's right to
information is not submerged beneath governmental obfuscation and mischaracterization" the
Court held that an agency must provide the requester with a complete description of each record
that has been withheld, together with a detailed justification explaining how each such record is
exempt from disclosure under the claimed exemption. Id. at 826. This so-called "Vaughn index"
has since become a staple of FOIA litigation. See, e.g., Lykins v. U.S. Dep't of Justice, 725 F.2d
1455, 1463 (D.C. Cir. 1984) (requiring agencies to provide a Vaughn index "enables the
adversary system to operate by giving the requester as much information as possible, on the basis
of which he can present his case to the trial court").

I.      **DEFENDANT MAY NOT REFUSE TO PROCESS PETA'S FOIA REQUESTS.**

        A.      **PETA Exhausted Its Administrative Remedies**.

        NIH contends that PETA's July 25, 2007 FOIA request is not properly before the Court
because PETA did not file an appeal of the initial denial of that request within the time period
prescribed by the agency's regulations. See NIH Memorandum ("Gov't Mem.") at 3-7. This
argument is completely defeated, however, by the fact that, as noted above, in a letter dated July

12, 2010, NIH informed PETA that it was providing a "substantive response" to PETA's appeal of the denial of the July 27, 2005 request.  See Pl. Ex. II.

Therefore, because the agency long ago informed PETA that it had provided a "substantive response" to PETA's appeal of the denial of its July 25, 2007 FOIA request, there simply is no basis for the government's position that this particular request should be dismissed from this case.  See, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 64 (D.C. Cir. 1990) (explaining that the purpose of the FOIA appeal process is to ensure that "the administrative route be pursued to its end") (emphasis added); see also Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 13 (2000) (a party is not required to exhaust administrative remedies where to do so would be "futile").  Because the agency already made clear that it had processed PETA's appeal of this matter, this is simply a non-issue.

### B.    NIH Has Unlawfully Asserted A Glomar Response.

NIH also may not continue to refuse to process PETA's FOIA request by asserting that it can neither confirm nor deny even the existence of any responsive records.  Such a response, called a "Glomar response" based on a decades-old FOIA case involving the CIA's refusal to confirm the existence of records that would show that it owned and operated a ship called the Hughes Glomar Explorer, see Phillipi v. CIA, 546 F.2d 1009, 1011 (D.C. Cir. 1976), is typically asserted in cases involving highly confidential national security matters, where to even disclose the existence of the requested records would, in and of itself, reveal extremely sensitive information.  See, e.g., id.; see also, e.g., Boyd v. Criminal Div. Of U.S. Dep't of Justice, 475 F.3d 381 (D.C. Cir. 2007); Valfells v. CIA, 717 F. Supp. 2d 110 (D.D.C. 2010).

Here, NIH has asserted a "Glomar response" to refuse to process PETA's request based

on its assertion that to even confirm that it has in its possession records concerning an

investigation of the allegations made by PETA and others against Auburn University researchers

Lothrop, Tillson, and Niemeyer, would result in the "unwarranted invasion of personal privacy"

of these particular individuals.  See Gov't Mem. at 10 (asserting Glomar response "to protect the

privacy of these individuals" who were "specifically named" in PETA's FOIA request); id. at 11

(explaining that NIH is relying on the privacy exemptions to FOIA, Exemption 6 and 7(C) "to

withhold any records it might have," "[b]ecause plaintiff never provided to NIH a privacy waiver

or written permission for the agency to release information about the specifically named

individuals," and therefore "NIH . . . presume[s] that this information was exempt from

disclosure" (emphasis added)).

 However, in Nation Magazine v. U.S. Customs Serv., 71 F.3d 885 (D.C. Cir. 1995), the

Court of Appeals for this Circuit held that to evaluate the propriety of a Glomar response, the

agency    and hence the reviewing court    must balance the asserted privacy interest against the

public interest in disclosure.  Id. at 893.  Furthermore, the government bears the burden to prove

that the asserted personal privacy interest outweighs the public's interest in the requested records.

Id. at 892.

 Here, NIH appears to be asserting both Exemptions 6 and 7(C) for its Glomar Response.

See Gov't Mem. at 11 (cross-referencing its discussion of Exemptions 6 and 7(C) with respect to

its Glomar response).  Therefore, to meet its burden of proof that it can refuse to process

plaintiff's request under Exemption 6, NIH must demonstrate that even confirming the existence

of any investigatory records concerning Drs. Lothrop, Tillson, or Niemeyer "would constitute a

clearly unwarranted invasion" of these individuals' "personal privacy."  5 U.S.C. § 552(b)(6)

(emphasis added).  Moreover, by employing the term "clearly" unwarranted, Congress has instructed the court "to tilt the balance in favor of disclosure."  Getman v. NLRB, 450 F.2d 670, 674 (D.C. Cir. 1971) (emphasis added).  Similarly, to meet its burden that it may refuse to process PETA's request under Exemption 7(C), NIH must prove that admitting the mere existence of any responsive records "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

Further, because both exemptions require a demonstration that any invasion of privacy is "unwarranted," the agency must demonstrate that the privacy interests it seeks to protect outweigh the public interest in disclosure.  See, e.g., Dep't of Air Force, 425 U.S. at 378-80 (Exemption 6); Reporters Comm., 489 U.S. at 771-72 (Exemption 7(C)).  Here, as demonstrated below, when the requisite balancing is done, there can be no question that the public interest in NIH at least processing plaintiff's request for responsive records far outweighs any personal privacy interest that is being asserted by the agency.

## C.   The Public Interest In Disclosure Far Outweighs The Asserted Privacy Interest.

### 1.   NIH Has Failed To Demonstrate A Viable Personal Privacy Interest.

Any legitimate personal privacy interest at stake in processing PETA's request is extremely de minimis for several reasons.

First, disclosure of whether these three researchers have been the subject of any investigations by NIH does not implicate their "personal" privacy    indeed, admitting this fact would not disclose any personal information about these individuals at all.  Rather, it would bear only on whether they were the subjects of an investigation concerning their professional conduct,

and, in particular, whether they had conducted their animal research consistent with animal

welfare and government grant requirements.  As such, there is little "personal privacy" at stake in

NIH confirming the existence of these records.  See, e.g., Cohen v. EPA, 575 F. Supp. 425, 429

(D.D.C. 1983) ("The privacy exemption does not apply to information regarding professional or

business activities") (citing Kurzon v. HHS, 649 F.2d 65, 69 (1st Cir. 1981)); Sims v. CIA, 642

F.2d 562, 574 (D.C. Cir. 1980); see also Wash. Post v. HHS, 690 F.2d 252, 262 (D.C. Cir. 1982)

(disclosure of financial information of government consultants involves only a minimum

invasion of privacy).

Second, the fact that these three researchers are the subject of an NIH investigation is

already publicly known.  Thus, as explained supra, PETA's 53-page Complaint to the USDA and

NIH specifically identified each of these researchers, and asked the government to investigate

evidence that they were violating the AWA and misusing federal grant money for private

"clinical" services (i.e., kidney transplant experiments).  See Pl. Ex. W.  Therefore, because

NIH's own Policy states that it "will" investigate such "allegations of noncompliance" with the

Animal Care Policy, see Pl. Ex. D at 10 (emphasis added), unless NIH has violated this directive

which itself would be a matter of great public interest   the fact that the agency has some

investigatory records about these matters is already publicly established, by operation of the

agency's own Policy.

Moreover, the USDA has already publicly released voluminous documents demonstrating

that these three researchers are the subject of investigations of alleged violations of the AWA

including copies of Dr. Holland's 2005 Complaint and PETA's 53-page 2006 Complaint   both

of which refer to these researchers by name throughout, see Pl. Exs. R, JJ; Goodman Decl. ¶ 16,

as well as an internal memorandum stating that PETA's Complaint was "partially valid."  See Pl.

Ex. Y; Goodman Decl. ¶ 16.  Therefore, NIH is wrong when it states in its brief that there is "no

evidence that NIH, or any other federal agency," has "publicly acknowledged the existence of

any investigation relating to these specifically named individuals," Gov't Mem. at 10 (emphasis

added)   the USDA has done so.  Auburn University has also confirmed that NIH has conducted

an investigation of PETA's complaint against these three individuals.  See Pl. Ex. FF

(acknowledging that "PETA's interest in these matters . . . resulted in an investigation by NIH").

Therefore, as another judge of this court succinctly stated in another FOIA case involving the

invocation of the privacy exemptions, "the cat is out of the bag," Showing Animals Respect &

Kindness v. U.S. Dep't of Interior, 730 F. Supp. 2d 180, 192 (D.D.C. 2010)   at least as to

whether NIH should have documents that are responsive to PETA's FOIA request.

Thus, because the record demonstrates that the fact that NIH conducted some kind of

investigation of PETA's allegations of misconduct has already been publicly disclosed, there

certainly is no particularly overarching "personal privacy" justification for NIH's refusal to

process PETA's FOIA request for these investigatory records.  See also Am. Civil Liberties

Union v. U.S. Dep't of Defense, 828 F.3d 612, 620 (D.C. Cir. 2011) (recognizing that if the

government "officially acknowledged information, a FOIA plaintiff may compel disclosure of

that information"); Chesapeake Bay Found. Inc. v. U.S. Army Corps of Eng'rs, 722 F. Supp. 2d

66, 72 (D.D.C. 2010) ("'The FOIA exemptions do not apply once the information is in the public

domain'" (quoting Hall v. U.S. Dep't of Justice, 552 F. Supp. 2d 23, 30-31 (D.D.C. 2008));

Detroit Free Press, Inc. v. U.S. Dep't of Justice, 73 F.3d 93, 97 (6th Cir. 1996) (the government

cannot withhold mug shots of individuals already "identified by name by the federal

government").

Third, the fact that both the USDA and Auburn University   the employer of these

individuals   have not deemed it necessary to shield these particular individuals from being

identified as the subject of various investigations for their treatment of research animals further

undermines any notion that release of this fact would nevertheless constitute a serious invasion of

the researchers' "personal privacy."

Fourth, although the <u>only</u> "privacy" interest actually articulated by the government is that

"individuals who engage in or who are associated with animal research are frequently the target

of harassment and threats, and at times actual acts of violence," Gov't Mem. at 21 (quoting

Maloney Decl. ¶2b), the fact that these three individuals are engaged in research on animals is

also already well known to the public.  Indeed, the researchers themselves have publicized this

fact by publishing their kidney transplant studies.  <u>See, e.g.</u>, K. Broaddus, <u>et al.</u>, "Renal Allograft

Histophathology in Dog Leukocyte Antigen Mismatched Dogs After Renal Transplantation,"

35:125 Veterinary Surgery at 135 (2006); Goodman Decl. ¶ 9.  As discussed <u>supra</u> at 11, Auburn

University disseminated a press release touting these experiments by Drs. Lothrop and Tillson.

<u>See</u> Pl. Ex. N.  These experiments, and the fact that they were being performed by Drs. Lothrop

and Tillson, were also discussed in an article published by "Veterinary News"   a newsletter

widely distributed to researchers and others who keep abreast of these issues.  <u>See</u> Goodman

Decl. ¶ 9.  Furthermore, NIH itself publishes on its website the names of researchers who receive

federal funding, including, for example, Dr. Lothrop, and it also publishes a description of the

kind of animal research for which they have been granted federal funding.  <u>See</u> Goodman Decl.

¶ 8.

Indeed, despite the fact that for years PETA and the public at large have known that these three researchers (a) conduct animal research, (b) have been the subject of complaints to the federal government about their treatment of animals, and (c) have also been the subject of government investigations concerning that treatment, NIH has conspicuously failed to produce any evidence whatsoever that any of these individuals has ever been "the target of harassment and threats" or "acts of violence."  Gov't Mem. at 21.  Instead, in support of its assertion on this point, NIH has submitted an unsworn letter that it obtained from Auburn after this lawsuit was filed    and apparently in response to a direct solicitation from NIH    which states that "[r]elease of the documents in question could cause harm to Auburn University," because it has "received threats of personal harm to individuals that are associated with animal research at our institution."  See Gov't Mem. at 21-22 (citing Mantoan Decl.); see also Exhibit 4 to Mantoan Decl. (stating that Auburn was providing this letter to NIH in response to "information [NIH] provided" to the University "regarding the documents in question").

However, such unsworn hearsay attached to an agency's declaration simply fails to satisfy the agency's evidentiary burden on this issue.   See Fed. R. Civ. P. 56(c)(4) ("an affidavit or declaration used to support a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated." (emphasis added)); see also, e.g., N.C. Network for Animals v. U.S. Dep't of Agric., 924 F.2d 1052 (Table) (4th Cir. 1991) (affidavit of FOIA officer and 16 unsworn answers to questionnaire from regulated industry does not satisfy requirements of Rule 56); Jameson v. Jameson, 176 F.2d 58, 61 (D.C. Cir. 1949) (personal knowledge requirement is mandatory, affidavits submitted in support of motion for summary

judgment must follow "'substantially the same form as though the affiant were giving testimony in court.'") (internal quotation omitted); accord, Wash. Post Co. v. Keogh, 365 F.2d 965, 971 (D.C. Cir. 1966).  Because this unsworn letter is rank hearsay, absent some showing that it falls within one of the exceptions to the hearsay rule, it simply cannot suffice to meet the agency's burden of proof here.  See Fed. R. Evid. Rule 802 ("Hearsay in not admissible"); Id. R. 801 (definition of hearsay).

Moreover, even if this letter were admissible, it conspicuously fails to offer any specific information about the source or recipients of these alleged "threats" that the agency has received, and both Auburn and the agency fail to explain how NIH's mere processing of PETA's FOIA request will somehow expose these particular researchers to any more of a risk of "harassment" than has existed for years by virtue of the University's own boasting of the kind of animal research being done there, as well as its public naming of the individuals who are conducting that research   including researchers at issue in this case.  See also Letter to PETA from Auburn General Counsel (May 23, 2008), Pl. Ex. FF (verifying that PETA's Complaint about these particular researchers "resulted in an investigation by NIH") (emphasis added).  Nor, likewise, does this inadmissible letter   or NIH   explain how NIH's processing of PETA's FOIA request will expose the researchers to "threats" of violence, when the USDA has already released voluminous documents under the FOIA identifying Drs. Lothrop, Tillson, and Niemeyer as the Auburn University researchers who were alleged both by PETA and Auburn veterinarian Dr. Holland to be mistreating animals and inappropriately using federal funds.  See USDA released copy of PETA's Animal Welfare Complaint, Pl. Ex. JJ; USDA released copy of Dr. Holland's Complaint, Pl. Ex. R; Goodman Decl. ¶ 16.  See, e.g., Showing Animals Respect, 170 F. Supp.

2d at 193 ("[i]t s unclear how the release of the videos at issue would materially add to the invasion of privacy that has already occurred").

Therefore, because the unsworn letter relied on by NIH is both inadmissible hearsay and also sorely lacking in details regarding the supposed "threats" that the University has actually received, it simply cannot suffice to meet the government's burden of proof here that the mere processing of plaintiff's request will cause a "clearly" or, for that matter, <u>any</u> "unwarranted" invasion of these researchers' "personal privacy."  <u>See</u> <u>Fine v. U.S. Dep't of Energy Office of Inspector Gen.</u>, 823 F. Supp. 888, 896 (D.N.M. 1993) ("[d]efendant has offered neither fats nor supported inferences tending to show that the plaintiff might be inclined to harass or intimidate persons"); <u>Alliance for the Wild Rockies v. U.S. Dep't of Interior</u>, 53 F. Supp. 2d 32 (D.D.C. 1999) (rejecting unspecified showing that commenters on grizzly bear regulations would be "harassed" if their names were released under FOIA); <u>see also</u> <u>In re Physicians Comm. for Responsible Med. v. Hogan</u>, 29 Misc. 3d 1220(A), 2010 WL 4536802, *4 (NY. Sup. Ct. Nov. 3, 2010), slip op. at 3 (noting "paucity of proof in admissible form submitted in support of [state government's] claim" that release of information about animal research would pose a threat of "risk to life or safety").

The only other evidence proffered by NIH to support its claim that these researchers will be "harassed and threatened" simply by the processing of PETA's FOIA request is a case involving a criminal conviction of certain individuals under the Animal Enterprise Protection Act, 18 U.S.C. § 43, <u>United States v. Fullmer</u>, 584 F.3d 132 (3d Cir. 2009), a tort case enjoining individuals from harassing animal researchers, <u>Novartis Vaccines & Diagnostics Inc. v. Stop Huntington Animal Cruelty USA, Inc.</u>, 50 Cal. Rptr. 3d 27 (Cal. App. 1 D. 2006), and a website

-35-

that apparently lists names of laboratories that do animal research.  See Gov't Mem. at 22.

However, other than fueling NIH's unabashed attempt to unfairly bias this Court against all

animal protection groups, none of these materials has any bearing on this FOIA case, since they

provide no basis beyond pure speculation that the processing of PETA's FOIA request will lead

to any such comparable behavior.  Indeed, if anything, NIH's reliance on these particular cases

serves to highlight that there are ample safeguards in place to deter the kind of nefarious conduct

about which NIH purports to be concerned.  See, e.g., Landmark Legal Found. v. IRS, 87 F.

Supp. 2d 21, 28 (D.D.C. 2000) (rejecting government's claim that disclosure of names will

subject individuals to harassment, because "the IRS has suggested no reason why existing laws

are insufficient to deter any criminal or tortious conduct targeted at person who would be

identified" (emphasis added)).

        In any event, because, as demonstrated, both the federal government and Auburn itself

have already publicly disclosed the fact that these researchers have been the subject of

government investigations, and because the fact that these individuals are engaged in animal

research is also widely disseminated by both the researchers and NIH themselves, see supra at

32-33    the government simply can not meet its burden of proof that the mere processing of

PETA's FOIA request will nevertheless subject these individuals to any "harassment and

threats."  Gov't Mem. at 21.  Thus, as one judge recently explained in rejecting a similar

argument made under the open records law for the state of New York, because "[t]he record

overwhelmingly demonstrates that documents linking the subject researchers to animal research

and disclosing many of the particulars of their research    the same type of information that [the

government] claims must be withheld . . . already are available to the public through a wide array

of sources," the agency simply cannot demonstrate the requisite "non-speculative causal connection" between the release of the requested records and the possibility that any researchers will be harassed by anyone.  In re Physicians Comm., 2010 WL 4536802 at *4; see also Dep't of Air Force, 425 U.S. at 380, n.19 (for the privacy exemptions to apply under FOIA the relevant "threats to privacy interests" must be "more palpable than mere possibilities") (emphasis added).

For all of these reasons, any "personal privacy" interest at stake here is extremely minimal, at best.

## 2. **There Is A Strong Public Interest In The Requested Records.**

After considering the significance of the privacy interest at stake, the Court must then balance that interest against the public's interest in disclosure.  Nation Magazine, 71 F.3d at 894. Here, while any privacy interest at issue is extremely slight, if not non-existent, the public's interest in disclosure of the requested information is unquestionably strong.  Thus, PETA's effort to find out what if any action NIH has taken in response to its formal complaint detailing rampant violations of the AWA and the misuse of federal funds "falls squarely within [FOIA's] statutory purpose" to make available to the public "information that sheds light on an agency's performance of its statutory duties."  Reporters Comm., 489 U.S. at 773; see also Dep't of Air Force, 425 U.S. at 372 ("the basic purpose" of FOIA is "to open agency action to the light of public scrutiny"); Stern v. FBI, 737 F. 2d 84, 92 (D.C. Cir. 1984) (the public has a strong interest "in knowing how public employees are performing their jobs").

As plaintiff has demonstrated, supra at 3-8, the issue of whether those who conduct research on animals are treating them humanely is a matter of great public interest   one that Congress has codified in both the Animal Welfare Act, see, e.g., 7 U.S.C. § 2131 (stating

Congressional "policy" to "insure that animals intended for use in research facilities . . . are provided humane care and treatment" (emphasis added)), and the Health Research Extension Act, see 42 U.S.C. § 289d(a) (directing Secretary of HHS to "establish guidelines for . . . [t]he proper care of animals to be used in biomedical and behavioral research" (emphasis added)).

The public has a similarly strong interest in ensuring that federal taxpayer dollars are not misused   an additional topic of the records requested by PETA.  See, e.g., NIH Grants Policy Statement (Oct. 1, 2010), Pl. Ex. F at 8.1.1 (requiring institutions receiving federal funds to "ensure that costs charged to awards are allowable, allocable, reasonable, [and] necessary" (emphasis added)).  Indeed, Congress has enacted the False Claims Act, 31 U.S.C. §§ 3729 et seq., precisely for this purpose   i.e., "to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims are made.  Rainwater v. United States, 356 U.S. 591 (1958); see also United States, ex rel. Haight v. Catholic Healthcare W., Civ. No. 01-2253, 2007 WL 2330790 at *2 (D. Ariz. Aug. 14, 2007) (noting the records obtained under FOIA can be relied on to pursue qui tam actions under the False Claims Act).

These expressions of congressional policy underscore the strong public interests at stake here.  See, e.g., Wash. Post v. HHS, 690 F.2d at 264 ("that public disclosure of conflict-of-interest information is vital is strengthened by Congress' passage of the Ethics in Government Act"); Cohen v. EPA, 575 F. Supp. 425, 430 (D.D.C. 1983) (noting as part of the balancing required by the privacy exemptions that Congress has "emphasized the importance of hazardous waste pollution by passing a law providing funds to clean up hazardous waste disposal sites as

-38-

rapidly as possible").  However, that interest is even more forceful here, where, as demonstrated supra, the federal government is notoriously ineffective in enforcing the animal welfare laws.

Hence, PETA has for years relied on the FOIA to obtain important information about violations of the AWA and NIH Policy, as well as the agencies' lack of enforcement of these dictates, in order to inform the public, Congress, and the federal government itself about these crucial matters, in an effort to promote the very animal protections that Congress has deemed so important.  See Goodman Decl. at ¶¶ 4-5; see also In re Physicians Comm., 2010 WL 4536802 at *8 (noting a strong public interest in "the activities of oversight entities in relation to allegations of non-compliance with animal welfare laws and regulations" (emphasis added)).  Indeed, as demonstrated, it was largely due to PETA's investigative work that Congress imposed the very animal care requirements that at issue in this case.  See supra at 5.  NIH should not be allowed to engage in the very kind of "governmental obfuscation" that FOIA was intended to eliminate. See Vaughn, 484 F.2d at 826; see also Dep't of Air Force, 425 U.S. at 362 ("[w]ithout question, the [FOIA] . . . seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands" (emphasis added)).

That there is a significant public interest in these matters is further demonstrated by the extensive coverage of PETA's August 2006 Complaint by the print and broadcast news, as well as on the internet.  See, e.g., Jeffrey Brainard, PETA Accuses Auburn U. of Animal-Care Violations, Citing Undercover Investigation, Chron. Higher Educ., Oct. 2, 2006; Animal Rights Group Critical of Auburn Veterinary Care, Associated Press, Oct. 4, 2006; NBC 13 News at 10 (WTVM (Columbus, Ga.) broadcast Oct. 4, 2006); 8 News at 10 (WAKA-CBS (Montgomery-

Selma, Ala.) broadcast Oct. 4, 2006); <u>PETA Critical Of Animal Care At Auburn Veterinary</u>
<u>School</u>, Associated Press, Oct. 5, 2006, previously available at http://www.al.com/ and
http://www.ledger-enquirer.com/; Tiatiana Richards, <u>AU Accused of Animal Abuse</u>, Montgomery
Advertiser, Oct. 5, 2006; Lisa Robertson, <u>Elyria Woman Wants Pet Surgery Refund: Dog Died 3</u>
<u>Days After Costly Transplant</u>, Chronicle-Telegram (Elyria, Ohio), Oct. 6, 2006; <u>News Channel</u>
<u>19 at 10</u> (WOIO-TV, CBS/19 (Cleveland, Ohio) broadcast Oct. 4, 2006); <u>12 News at 10:00</u>
(WSFA-NBC (Montgomery-Selma, Ala.) broadcast Oct. 4, 2006).   There has also been
considerable discussion of this matter on the internet.  <u>See, e.g.</u>, Runtheoption22, Thread on
<u>PETA Undercover on Auburn University</u>, Tide Fans (Oct. 4, 2006),http://tidefans.com/forums
/non-sports/47230-peta-undercover-auburn-university.html; Lee P., <u>PETA Targets Auburn</u>,
ABama Blog (Oct. 6, 2006), http://abamablog.blogspot.com/2006/10/peta-targets-auburn.html.

As also demonstrated, the Morris Animal Foundation thought enough of PETA's
evidence to conduct its own audit of the University's research facility and not only to cease
funding of "future grants in which either Dr. Clinton Lothrop or Dr. Michael Tillson are listed as
principal investigators or co-investigators," but also to seek other reforms with respect to its
overall funding practices.  <u>See</u>  Pl. Ex. Z.

Remarkably, despite NIH's obligation under both Exemptions 6 and 7(C) to weigh the
asserted privacy interest against the public's interest in disclosure    and, in the case of
Exemption 6 to "tilt the balance in favor of disclosure," <u>see</u> <u>Getman</u>, <u>supra</u>    the government
does not include <u>any</u> of these public interests in its disclosure calculation.  <u>See</u> Gov't Mem. at
23-24.  On the contrary, it summarily asserts that there is "<u>no public interest in the release of the</u>
<u>information</u>" requested by PETA because, according to the agency, "NIH has <u>released its final</u>

-40-

decision about the animal welfare investigations it conducted regarding Auburn University." Id. at 24 (emphasis added).

However, the sole citation for this statement is the Mantoan Declaration at ¶ 4, which in turn references three records dated September 10, 2004, August 24, 2005, and November 15, 2005, all of which were written months   and in one case almost two years   before PETA submitted its August 20, 2006 Complaint to the government.  Therefore, unless the agency is admitting that it did no investigation whatsoever of PETA's Complaint   and hence violated its own Animal Care Policy's directive that it "will" evaluate all such allegations of "noncompliance," Pl. Ex. D at 10, this particular explanation as to why NIH believed it was not required to process PETA's July 25, 2007 request makes no sense.  And, of course, if in fact the agency did not conduct any such investigation, there would be a strong public interest in requiring the agency to reveal this fact as well, since this too goes to the heart of the FOIA's core purpose, to let the people "know what their government is up to," Reporters Comm., 489 U.S. at 773, and hence, the agency" still could not, as a matter of law, refuse to "confirm or deny" the existence of responsive records.

Furthermore, it is well established that "the purpose of FOIA is to permit the public to decide *for itself* whether government action is proper," Wash. Post v. HHS, 690 F.2d 252, 264 (D.C. Cir. 1982) (emphasis in original); see also Beck v. Dep't of Justice, 997 F.2d 1489, 1493 (D.C. Cir. 1993) (noting "the public's interest in knowing that a government investigation has been comprehensive" (emphasis added)) (citing Stern v. FBI, 737 F.2d at 92); Showing Animals Respect, 170 F. Supp. 2d at 195 ("the public has an interest in finding out whether and under what circumstances certain individuals receive preferential treatment from government

-41-

investigators" (emphasis added)).  Therefore, the government's self-serving assertion that it has

already adequately addressed the matters included in PETA's 2006 Complaint does nothing to

extinguish the public's overriding interest in determining this matter "for itself."   Wash. Post v.

HHS, 690 F.2d at 264.

For all these reasons, the balance here tips decidedly in favor of requiring the agency to

process plaintiff's FOIA request.  See, e.g., Nation Magazine, 71 F.3d at 894-95 ("the mere fact

that records pertain to an individuals' activities does not necessarily qualify them for exemption

. . . if the information would shed light on agency action"); Judicial Watch v. U.S. Dep't of

Homeland Sec., 598 F. Supp. 2d 93, 94 (D.D.C. 2009) (documents pertaining to border patrol

agents convicted of shooting accused drug smuggler must be disclosed "[b]ecause plaintiff is

seeking information that sheds light on the [Department of Justice's] performance of its duties");

Rosenfeld v. U.S. Dep't of Justice, 57 F.3d 803, 812 (9th Cir. 1995) (disclosing names of FBI

investigation subjects would promote the public interest in "knowing whether and to what extent

the FBI investigated individuals for participating in political protests").[8]

---

[8] Neither of the cases relied on by the government for its "Glomar response," Gov't Mem.
at 9-10, leads to a different result.  As already demonstrated, Reporters Comm. unequivocally
supports plaintiff's argument, since, unlike the "rap sheets" at issue there, which the Court found
had no cognizable public interest under FOIA, see 489 U.S. at 773-774, here, plaintiff's request
is in furtherance of what the Court recognized was "the basic purpose" of FOIA.  Id. at 772.
Nor does Jefferson v. U.S. Dep't of Justice, Office of Prof'l Responsibility, 284 F.3d 172 (D.C.
Cir. 2002) help the government's cause.  Indeed, in that case, in sharp contrast to this one, not
only did the court grant the plaintiff access to the requested records that pertained to the
complaint that he filed against the U.S. Attorney, see id. at 175, but the trial court also
specifically found that the remaining records at issue "would not shed light on the agency's
conduct," id. at 176    a finding that simply cannot be made here.

Accordingly, the Court should order NIH to immediately process plaintiff's July 25, 2007 and August 21, 2008 FOIA requests, and to release all non-exempt information and provide plaintiff with a <u>Vaughn</u> index with respect to any information that the agency contends is exempt from disclosure.

## II.   BECAUSE THE AGENCY CANNOT MEET ITS BURDEN OF PROOF THAT THE "CONFIDENTIALITY AGREEMENT" IT MADE AUBURN SIGN IS EXEMPT FROM DISCLOSURE, THIS RECORD MUST BE RELEASED.

PETA also moves for summary judgment with regard to NIH's "confidentiality agreement" with Auburn University regarding this matter, which was also the subject of PETA's August 21, 2008 FOIA request.  <u>See</u> Pl. Ex. GG; Compl. ¶¶ 21, 26.  Because Auburn University a signatory to that document    has already independently confirmed that this record exists, <u>see</u> Email from Ralph Zee to Justin Goodman (Dec.12, 2007), Pl. Ex. CC, NIH may not continue to refuse to confirm or deny its existence.  <u>See</u> <u>supra</u> at 30-31 (where information has already been publicly acknowledged, it cannot be withheld under FOIA).

Moreover, NIH has not asserted any exemption that would allow it to continue to withhold this record, nor could it meet its burden of proof that any such exemption applies.  The confidentiality agreement is not a national security document (Exemption 1); does not relate "solely to the internal personnel rules and practices of an agency" (Exemption 2); is not exempt from disclosure pursuant to another statute (Exemption 3); is not information "obtained from a person" and hence exempt under the trade secret exemption (Exemption 4); is not a pre-decisional deliberative agency document (Exemption 5); is not a "personnel" or "medical" file or "similar file" within the meaning of Exemption 6; is not a law enforcement record and hence not exempt under Exemption 7; has nothing to do with the "regulation or supervision of financial

institutions" (Exemption 8); and does not in way pertain to "geological" or "geophysical"

information or maps (Exemption 9).

Accordingly, because NIH cannot meet its burden of proof that the confidentiality

agreement is exempt from disclosure, that document must be disclosed.

## **CONCLUSION**

For all of the foregoing reasons, defendant's motion to dismiss and for summary

judgment should be denied, plaintiff's motion for partial summary judgment should be granted,

and NIH should be required to provide PETA with the confidentiality agreement it required

Auburn University to sign, to fully process PETA's July 25, 2007 and August 21, 2008 FOIA

requests, to release all non-exempt information, and to provide a <u>Vaughn</u> index for any

information it contends is exempt from disclosure.

Respectfully submitted,

__/s/_____
Katherine A. Meyer
(D.C. Bar No. 244301)
Jessica Almy
(D.C. Bar No. 996921)
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.,  Suite 700
Washington, D.C. 20009
(202) 588-5206

Dated: April 29, 2011                              Counsel for Plaintiff

-44-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PEOPLE FOR THE ETHICAL          )
TREATMENT OF ANIMALS,           )
                                )
            Plaintiff,          )
                                )
    v.                          )
                                )       Civ No. 10-1818 (ABJ)
                                )
NATIONAL INSTITUTES OF HEALTH   )
DEPARTMENT OF HEALTH AND        )
HUMAN SERVICES,                 )
                                )
            Defendant.          )

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE
AND RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 7.1(h), plaintiff People for the Ethical Treatment of Animals

("PETA") submits this statement of material facts as to which there is no genuine issue.  Plaintiff

is also submitting a response to those facts included in defendant's statement of material facts

that are relevant to the issues that remain in this case.[1]

**A.      Plaintiff's Statement of Material Facts As To Which
         There Is No Genuine Issue**

1.      The Animal Welfare Act ("AWA") was enacted  "to insure that animals intended

for use in research facilities or for exhibition purposes . . . are provided humane care and

---

[1] As plaintiff explains in its accompanying memorandum, at 3 n.1, plaintiff is only
pursuing its claims with respect to the information that was withheld by defendant National
Institutes of Health ("NIH") pursuant to a "Glomar response," and the agency's withholding of a
"confidentiality agreement" that it required Auburn University to sign.  Accordingly, plaintiff has
not addressed defendant's statement of material facts with respect to other matters.

treatment." 7 U.S.C. § 2131(1).

2.      A 2005 Audit Report by the Inspector General for the Unites States Department of

Agriculture ("USDA") found that the Eastern Region of the agency's Animal Plant and Health

Inspection Service's Animal Care unit "is not aggressively pursuing enforcement actions against

violators of the AWA," and that some IACUCs "are not effectively monitoring animal care

activities or reviewing protocols." Audit Report: APHIS Animal Care Program, Inspection and

Enforcement Activities (Sept. 2005), Pl. Ex. C, at I-ii.

3.      As part of the Health Research Extension Act, Pub. L. No. 99-158 (Nov. 20,

1985), Congress gave the Department of Health and Human Services ("HHS")    NIH's parent

agency    authority to establish guidelines for the proper treatment of animals used in research in

NIH-funded laboratories.  See Pub. Health Service Act, 42 U.S.C. §§ 201 et seq.  Congress acted

in response to a widely publicized animal cruelty case based on an undercover investigation by

PETA.  See Reid G. Adler, Controlling the Applications of Biotechnology: A Critical Analysis of

the Proposed Moratorium on Animal Patenting, 1 Harv. J. Law & Tec. 1, 36-37 and n.233 (1988)

(explaining that this provision was enacted in response to a criminal case brought against a

federally-funded researcher for his cruel treatment of monkeys in research conducted at NIH's

Institute of Behavioral Research in Silver Spring Maryland).

4.      The USDA credits PETA's exposé of the cruel treatment of the "Silver Spring

monkeys" for 1985 amendments to the AWA that also strengthened protections for laboratory

animals.  See Benjamin Adams and Jean Larson, USDA Nat'l Agricultural Library, Animal

Welfare Information Center, Legislative History of the Animal Welfare Act,

http://www.nal.usda.gov/awic/pubs/AWA2007/intro.shtml.

5.      Pursuant to the Health Research Extension Act, the Public Health Service

("PHS")   an entity within HHS that oversees NIH   has issued a "Policy on Humane Care and Use of Laboratory Animals" ("Animal Care Policy" or "Policy") that is administered by the Office of Laboratory Animal Welfare ("OLAW").  See Pl. Ex. D. The Policy provides that, in addition to whatever supplemental standards an institution may adopt for its animal care program, research institutions must always comply with all applicable AWA regulations.  See Policy at 9 n.2 ("Compliance with the USDA regulations is an absolute requirement of this Policy").

6.      OLAW is responsible for the general administration and coordination of the Animal Care Policy.  Id. at 18.  The Policy states that OLAW "will . . . evaluate allegations of noncompliance with this Policy."  Id. at 10.

7.      The Humane Society of the United States reported in 2006 that "OLAW rarely, if ever, follows up first-hand to make sure that corrective plans are implemented and followed" by institutions that report departures from mandated standards, and that it has failed to exercise much needed federal oversight when "serious problems" arise concerning animal care at institutions receiving NIH funding.  See L. Gomez, et al., Noncompliance with Public Health Service (PHS) Policy on Humane Care and Use of Laboratory Animals: An Exploratory Analysis (2006), Pl. Ex. E, at 6, 9.

8.      NIH  requires institutions receiving federal funds to "ensure that costs charged to awards are allowable, allocable, reasonable, [and] necessary," see NIH Grants Policy Statement (Oct. 2, 2010), Pl. Ex. F, at 8.1.1, and grant recipients "are required to report deviations from budget and program plans, and request prior approvals for budget and program plan revisions." 45 C.F.R. § 74.25(c)(1).

9.      Congress enacted the False Claims Act, 31 U.S.C. §§ 3729 et seq., to protect the

funds and property of the Government from fraudulent claims.

10.     Auburn University, a state operated university located in Auburn, Alabama, has

for years received millions of dollars in federal funding from NIH to conduct various research on

dogs and other animals.   According to NIH's website, since 2005, Auburn has received

approximately $15.5 million dollars in such grant money.  Declaration of Justin Goodman ¶ 10.

11.     On June 21, 2004, Auburn University issued a press release announcing that Dr.

Clinton Lothrop and his colleague, Dr. Michael Tillson, were leading a team of researchers who

had "developed a revolutionary new canine kidney transplant procedure that promotes increased

tolerance of transplanted organs between unrelated dogs."  Pl. Ex. N.

12.     On November 17, 2004 Public Health Service officials notified Auburn

University of the "Findings" of "an External Review Committee Regarding Animal Welfare

Issues Related to Research Projects Directed by Dr. Clint Lothrop at Auburn University."  Pl. Ex.

Q.  Based on its own investigation, the review committee reported that "the concerns about

adequacy of veterinary care for dogs in Dr. Lothrop's research projects . . . were justified," that

"veterinary care and supervision provided for dogs in the renal transplantation project was

sometimes inadequate," that Dr. Lothrop's absences from work "caused disruptions in the

delivery of timely veterinary care for his research dogs," and that "Dr. Lothrop failed to revise the

project's approved IACUC protocol in a timely manner to properly reflect [] changes in study

design and treatment protocols . . . ."  Id. at 1-2.

13.     Records obtained by PETA under the FOIA from the USDA show that on June 7,

2005, Dr. Merrillee Holland submitted a 67-page complaint to the USDA concerning the dog

kidney transplant experiments being conducted by Drs. Lothrop and Tillson.  Pl. Ex. R;

Goodman Decl. ¶ 16.  Dr. Holland presented detailed evidence that the researchers are "negligent

when it comes to post-surgical follow-up care," resulting in what she characterized as "some of the worst suffering I have seen in my career." Pl. Ex. R. She also stated that, although she had tried to have her concerns addressed internally at the University, "little has changed for the animals used in the experiments," and, thus, she urged the USDA to "review this matter on its own and cite the university for violations of the Animal Welfare Act." Dr. Holland's complaint, identified "Drs. Clint Lothrop and Michael Tillson" as the individuals about whom she complained. Id.

14.     In response to Dr. Holland's complaint, the USDA conducted an inspection of Auburn's Research Center, and, on August 4, 2005, issued an "Inspection Report" citing Auburn University with several violations of the AWA with respect to the renal transplantation procedures, including, inter alia, failure to obtain approval of certain procedures from the IACUC, failure to consider alternatives to procedures that cause pain and distress to the animal, failure to include a complete description of anesthesia practices, and failure to properly label and maintain various medications. See Inspection Report (Aug. 4, 2005), Pl. Ex. T.

15     On September 27, 2005, an individual working at Auburn University sent a letter to the Director of NIH to report the "misappropriation of NIH funds" by Dr. Lothrop and another colleague, Glenn Niemeyer, who, the individual alleged, were using money awarded by NIH for research for a project entitled "Elastase and B3A Function in Cyclic Hematopoiesis Dogs" (commonly referred to as "the grey dog grant") to perform renal transplants for private clients. See Letter to Dr. Zerhouni, Director of NIH (Sept. 27, 2005), Pl. Ex. V; Goodman Decl. ¶ 8.

16.     On August 30, 2006, PETA sent the USDA and NIH a 53-page "formal complaint" detailing numerous eye-witness accounts of alleged violations of the AWA by Drs. Lothrop, Tillson, and Niemeyer, including three DVDs with undercover video footage depicting

the complained about practices.  Pl. Ex. W.  PETA's Complaint  also reported that "all" of the

work in Dr. Lothrop's lab "is paid for using funds from a grant titled, 'Elastase and B3A

Function in Cyclic Hematopoiesis Dogs,' funded by the National Institutes of Health (NIH)," and

that "[m]oney from this grant is misappropriated and spent on all lab supplies; diagnostic and

genetics tests for client transplant dogs as well as for dogs use in all other research projects . . .

[and] salaries for lab workers not involved in the NIH-funded project."  Id. at 4.  Based on this

evidence, PETA urged the agency to "immediately conduct a thorough investigation of the labs at

Auburn University," and to make sure that researchers who are found to be in violation of AWA

regulations were "prohibited from using animals," that Dr. Lothrop's NIH funds "be revoked

immediately," and he never be allowed "to receive the public's tax dollars or to conduct research

on animals," and that "[d]ogs who are found to be suffering from illness . . . be immediately

relieved of their suffering."  Id. at 5.

17.     An internal USDA memorandum dated January 10, 2007, states that PETA's

Complaint "was determined to be partially valid."  Pl. Ex. Y.

18.     To date, NIH has not informed PETA of any enforcement action that it has taken

in response to PETA's August 2006 complaint.  See Goodman Decl. ¶ 15.

19.     On June 5, 2008, an official for the Morris Animal Foundation sent a

memorandum to PETA, stating that it had conducted its own audit and concluded that, based on

"lapses in animal care and not complying with research protocols," it would "not fund any future

grants in which either Dr. Clinton Lothrop or Dr. Michael Tillson are listed as principal

investigators or co-investigators," that it would "not fund studies involving live animals at

Auburn University until [it has] received verification that the university has implemented

strategies to ensure that animals used in research are not harmed and receive outstanding care,

exercise and socialization," and that it would "increase scrutiny of Institutional Animal Care and

Use Committee (IACUC) processes and procedures for all universities submitting grants."  Pl.

Ex. Z.

20.     In 2007, Dr. Lothrop left Auburn University and was hired by the University of

Alabama-Birmingham. Goodman Decl. ¶ 11.  According to NIH's website, since July 2007, Dr.

Lothrop has received more than $1.3 million in additional grant money from NIH to conduct

experiments on dogs.  Id.  Dr. Niemeyer has recently joined Dr. Lothrop at the University of

Alabama-Birmingham.  Id. ¶ 12.  Dr. Tillson remains at Auburn University, which also continues

to receive NIH funding for animal research.  Id.  According to NIH's website, since 2006 Auburn

University  has been awarded approximately $ 12,365,035 in federal research grants.  Id. ¶ 8.

21.     On July 25, 2007, PETA submitted a FOIA request to NIH for records "related to

all [NIH] investigations into complaints filed in 2005-present regarding NIH grant recipients

Clint Lothrop . . . , Glenn P. Niemeyer . . . , and colleague Michael Tillson."  Pl. Ex. AA.

22.     On  September 7, 2007, PETA sent a request to Auburn University under the

Alabama Open Records Act for similar records.  Pl. Ex. BB.  On December 12, 2007, Auburn

sent PETA a follow-up email stating that it could not provide PETA with any additional records

because of a "signed confidentiality agreement with NIH."  See Email from Ralph Zee to Justin

Goodman, Pl. Ex. CC.

23.     On February 20, 2008, NIH sent PETA what it referred to as a "final response" to

PETA's July 25, 2007 FOIA request in which the agency stated that it "neither confirms nor

denies the existence of any responsive records," because to do so would cause a "clearly

unwarranted invasion of personal privacy," within the meaning of Exemption 6 of FOIA.  Pl. Ex.

DD.  In the same letter, NIH stated that, based on its refusal to confirm or deny the existence of

responsive records, it had "not completed a search for responsive to" PETA's request.  Id.

24.     On March 4, 2008, PETA sent Auburn University a request under the Alabama

State Open Records Law for records relating to the dog experiments being done by Drs. Lothrop,

Niemeyer, and Tillson, and requested a copy of the "signed confidentiality agreement" between

AU and the NIH.  Pl. Ex. EE.

25.     On May 23, 2008, Auburn University confirmed its refusal to provide PETA with

those records.  Pl. Ex. FF.  In that letter, Auburn's General Counsel stated that "PETA's interest

in the matters that are the subject of [its] request resulted in an investigation by NIH . . . ."

However, he reiterated that the University was "not at liberty to disclose any further information"

concerning the matter, because NIH had "requested [that] the University enter into the

[confidentiality] agreement."  Pl. Ex. FF.

26.     On August 21, 2008, PETA sent NIH a new request for materials related to all

NIH investigations into complaints regarding the same researchers, as well as "copies of any

signed confidentiality agreement between Auburn University and NIH relating to materials and

information with regard to an investigation into the research of Clinton Lothrop and colleagues."

Pl. Ex. GG.  By letter dated August 26, 2008, NIH refused to confirm or deny the existence of

any such records.  See Pl. Ex. HH.

27.     On July 12, 2010, NIH sent PETA a letter that it represented as a "substantive

response to the appeal"of both PETA's July 25, 2007 request for the investigatory records

concerning Drs. Lothrop, Tillson, and Niemeyer, as well as PETA's August 26, 2008 request for

access to the "confidentiality agreement" NIH had entered into with Auburn, and again stated

that it could neither confirm nor deny the existence of any such records.  Pl. Ex. II. at 2 ("this

letter offers a substantive response to the appeal of both matters").

28.    Disclosure of whether the three Auburn University researchers were the subject of any investigations by NIH would not reveal personal information about the lives of these researchers.

29.    PETA's 53-page Complaint to the USDA and NIH specifically identified Drs. Lothrop, Tillson, and Niemeyer, and asked the government to investigate evidence that they were violating the AWA and misusing federal grant money for private "clinical" services (i.e., kidney transplant experiments).  See Pl. Ex. W.

30.    The USDA has publicly released documents demonstrating that these three researchers are the subject of investigations of alleged violations of the AWA   including copies of Dr. Holland's 2005 Complaint and PETA's 53-page 2006 Complaint   both of which refer to these researchers by name throughout, Pl. Exs. R, JJ; Goodman Decl. ¶ 16, as well as an internal memorandum stating that PETA's Complaint was "partially valid." Pl. Ex. Y; Goodman Decl. ¶ 16.

31.    Auburn University has confirmed  to PETA that NIH has conducted an investigation of the matters covered in PETA's complaint about these three individuals.  Pl. Ex. FF (acknowledging that "PETA's interest in these matters . . . resulted in an investigation by NIH").

32.    Drs. Lothrop, Tillson, and Niemeyer publicized the fact that they were engaged in canine kidney transplant research.  See, e.g., K. Broaddus, et al., "Renal Allograft Histophathology in Dog Leukocyte Antigen Mismatched Dogs After Renal Transplantation, 35:125 Veterinary Surgery at 135 (2006); Goodman Decl. ¶ 9.

33.    NIH  publishes on its website the names of researchers who receive federal funding, and also publishes a description of the kind of animal research for which they have been

granted federal funding.  Goodman Decl. ¶ 18.

34.     The fact that Auburn University was receiving federal funding for the "grey dog"

experiments ("Elastase and B3A Function in Cyclic Hematopoiesis Dogs") was disclosed on

NIH's website, as was the name of the principal researcher, Dr. Clinton Lothrop.  See

http://projectreporter.nih.gov/ project_info_details.cfm?aid 6876403&icde 7755797.  Goodman

Decl. ¶ 8.  The amount of money that Auburn University has been awarded by NIH for the grey

dog research is disclosed on NIH's website, as is information showing that Auburn University is

currently receiving federal money for animal research:   http://projectreporter.nih.gov/

reporter_searchresults.cfm?&new 1&icde 7757087&loc 2&CFID 36624668&CFTOKEN 10

997136.  Goodman Decl. ¶ 8.

35      The fact that kidney transplants for dogs were being performed by Drs. Lothrop

and Tillson was discussed in an article published by "Veterinary News"    a newsletter widely

distributed to researchers and others who keep abreast of these issues.  See

http://veterinarynews.dvm360.com/dvm/article/articleDetail. jsp?id 105195.  Goodman Decl. ¶

9.

36     PETA relies on the FOIA to obtain information about violations of the AWA and

NIH Policy, and the government's enforcement of these laws.  Goodman Decl. at ¶¶ 4-5.

37.     PETA widely disseminates information to the public on its website,

http://www.peta.org, through direct mail, and via e-mail to its list subscribers; it also

disseminates information to its supporters on Facebook and through Twitter.  Goodman Decl. ¶

3.

38.     Information obtained by PETA from NIH and the U.S. Department of Agriculture

under FOIA has been used by PETA to prompt federal agencies to take action against research

facilities for violations of the Animal Welfare Act ("AWA"), the Public Health Service Policy on Humane Care and Use of Laboratory Animals, and the National Institutes of Health Grants Policy Statement.  Goodman Decl. ¶ 5.

39.     There has been media coverage of  PETA's August 2006 Complaint to the USDA and NIH.  See, e.g., Jeffrey Brainard, PETA Accuses Auburn U. of Animal-Care Violations, Citing Undercover Investigation, Chron. Higher Educ., Oct. 2, 2006; Animal Rights Group Critical of Auburn Veterinary Care, Associated Press, Oct. 4, 2006; NBC 13 News at 10 (WTVM (Columbus, Ga.) broadcast Oct. 4, 2006); 8 News at 10 (WAKA-CBS (Montgomery-Selma, Ala.) broadcast Oct. 4, 2006); PETA Critical Of Animal Care At Auburn Veterinary School, Associated Press, Oct. 5, 2006, previously available at http://www.al.com/ and http://www.ledger-enquirer.com/; Tatiana Richards, AU Accused of Animal Abuse, Montgomery Advertiser, Oct. 5, 2006; Lisa Robertson, Elyria Woman Wants Pet Surgery Refund: Dog Died 3 Days After Costly Transplant, Chronicle-Telegram (Elyria, Ohio), Oct. 6, 2006; News Channel 19 at 10 (WOIO-TV, CBS/19 (Cleveland, Ohio) broadcast Oct. 4, 2006); 12 News at 10:00 (WSFA-NBC (Montgomery-Selma, Ala.) broadcast Oct. 4, 2006).  There has also been discussion of this matter on the internet.  See, e.g., Runtheoption22, Thread on PETA Undercover on Auburn University, Tide Fans (Oct. 4, 2006),http://tidefans.com/forums /non-sports/47230-peta-undercover-auburn-university.html; Lee P., PETA Targets Auburn, ABama Blog (Oct. 6, 2006), http://abamablog.blogspot.com/2006/peta-targets-auburn.html.

**B.     Plaintiff's Response To Defendant's Statement Of Material Facts**

1-3.     Admitted.

4.      Denied.  See Pl. Exs. DD and II.

5-9.     Admitted.

10-17. These paragraphs are not relevant to the issues remaining in the case.

18.     Plaintiff admits the first sentence of this paragraph, but disputes the remaining

sentence as a misrepresentation of applicable law.  See Plaintiffs' Opposition at 27-42 (and the

Exhibits cited therein).

19.     Denied.  NIH itself informed PETA that because it has asserted a "Glomar

response" for the records at issue, it did not even process plaintiff's requests with respect to the

records covered by that response, and, accordingly, it has not released all non-exempt segregable

information.  See Pl. Ex. DD.

<div style="margin-left: 50%;">

Respectfully submitted,


__/s/_____
Katherine A. Meyer
(D.C. Bar No. 244301)
Jessica Almy
(D.C. Bar No. 996921)

 Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.  Suite 700
Washington, D.C.  20009
(202) 588-5206

</div>

Dated: April 29, 2011                    Counsel for Plaintiff

## PLAINTIFF'S EXHIBITS
Civ. No. 10-1818 (ABJ)

**Exhibit A**      Directive of President Obama (January 21, 2009)

**Exhibit B**      Letter to Marina Braswell from Katherine Meyer (Feb. 2, 2010)

**Exhibit C**      Audit Report: APHIS Animal Care Program, Inspection and Enforcement
Activities (September 2005)

**Exhibit D**      Public Health Service Policy on Humane Care and Use of Laboratory Animals

**Exhibit E**      Noncompliance with Public Health Service (PHS) Policy on Humane Care and
Use of Laboratory Animals: An Exploratory Analysis (2006)

**Exhibit F**      NIH Grants Policy Statement (Oct. 2, 2010) (Excerpts)

**Exhibit G**      Minutes of Meeting with Drs. Baker and Lothrop (Aug. 8, 2003)

**Exhibit H**      Email to Mike Hart from Henry Baker (Oct. 13, 2003)

**Exhibit I**      Memorandum from Dr. Holland to Dean Boosinger (Oct. 27, 2003)

**Exhibit J**      [There is no Exhibit J]

**Exhibit K**      Conclusions and Recommendations of the IACUC Subcommittee Regarding the
Issue of Veterinary Care for IACUC Protocols under the Direction of Dr. Clint
Lothrop (January 2004) (and attached email transmitting the report)

**Exhibit L**      Memorandum from Timothy Boosinger to Dr. Clint Lothrop (Mar. 9, 2004)

**Exhibit M**      Memorandum from Director of the Research Center to the Dean of the Veterinary
College (Apr. 6, 2004) (and attached "Historical Summary of Dr. Lothrop's
Unsatisfactory Performance")

**Exhibit N**      Auburn Press Release (June 21, 2004)

**Exhibit O**      Memorandum to Dr. Baker from Dr. Holland (July 18, 2004).

**Exhibit P**      Letter to Byron Blagburn (Aug. 2, 2004)

**Exhibit Q**      Letter to Michael Moriarty from External Review Committee (Nov. 17, 2004)

**Exhibit R**      Submission to USDA from Dr. Holland (June 7, 2005)

**Exhibit S**    Letter to Michael Moriarity, Vice President for Research, Auburn University, from Alex Wolff, Director, NIH Director of Division of Compliance Oversight (June 28, 2005)

**Exhibit T**    USDA Inspection Report (Aug. 4, 2005)

**Exhibit U**    Letter to Michael Moriarty from Dr. Axel Wolff (Aug. 24, 2005)

**Exhibit V**    Letter to Dr. Zerhouni, Director of NIH  (Sept. 27, 2005)

**Exhibit W**    PETA Complaint (Aug. 30, 2006) (Attached Videotapes Are Exhibits W1-W3)

**Exhibit X**    Statement of Dr. Marc Bekoff (Feb. 10, 2006)

**Exhibit Y**    USDA Animal Welfare Complaint (Jan. 11, 2007)

**Exhibit Z**    Memorandum from Morris Animal Foundation (June 5, 2008)

**Exhibit AA**   PETA FOIA Request to NIH (Aug. 30, 2006)

**Exhibit BB**   PETA Open Records Request to Auburn University (Sept. 7, 2007)

**Exhibit CC**   Email from Ralph Zee to Justin Goodman (Dec. 12, 2007)

**Exhibit DD**   NIH Letter to PETA (Feb. 20, 2008)

**Exhibit EE**   PETA Open Records Request to Auburn University (March 4, 2008)

**Exhibit FF**   Auburn University Letter to PETA (May 23, 2008)

**Exhibit GG**   Letter from PETA to NIH (Aug. 21, 2008)

**Exhibit HH**   Letter from NIH to PETA (Aug. 26, 2008)

**Exhibit II**   Letter from NIH to PETA (July 12, 2010)

**Exhibit JJ**    PETA's Aug. 30, 2006 Complaint as Released by the USDA under FOIA